No. 10-3891

In the
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

STATE OF MICHIGAN, et al.,
     Plaintiffs-Appellants,

and

GRAND TRAVERSE BAND OF OTTAWA AND CHIPPEWA INDIANS,
     Intervenor-Plaintiffs

v.

UNITED STATES ARMY CORPS OF ENGINEERS and METROPOLITAN
WATER RECLAMATION DISTRICT OF GREATER CHICAGO,
     Defendants-Appellees,

and

CITY OF CHICAGO, et al.,
     Intervenors-Defendants.

Appeal from the United States District Court
Northern District of Illinois, Eastern Division
Honorable Robert M. Dow, Jr.

BRIEF FOR PLAINTIFFS-APPELLANTS

<div style="margin-left:40%;">

Bill Schuette
Attorney General of Michigan

B. Eric Restuccia
Solicitor General
Co-Counsel of Record

Robert P. Reichel (P31878)
Louis B. Reinwasser (P37757)
Daniel P. Bock (P71246)
Assistant Attorneys General
Co-Counsel of Record
Attorneys for Plaintiffs-Appellants
ENRA Division
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540

</div>

Dated: February 9, 2011

# TABLE OF CONTENTS

<u>Page</u>

Table of Authorities ........................................................................ vi

Jurisdictional Statement ....................................................................1

      1.   Statement Concerning the District Court's Jurisdiction .....................1

      2.   Statement Concerning Appellate Jurisdiction....................................2

Statement of Issues Presented ...........................................................5

Statement of the Case........................................................................6

Statement of Facts ............................................................................8

I.    Chicago Area Waterway System (CAWS)....................................8

II.   Asian carp ..............................................................................10

III.  The Corps' Electrical Barrier System .........................................11

IV.  Evidence of Asian carp approaching and entering the CAWS ....................11

V.   Plaintiffs' requests for relief......................................................13

VI.  District Court litigation..............................................................14

Summary of Argument.....................................................................18

Argument.......................................................................................22

I.    The district court committed legal error, relied upon clearly erroneous findings of fact and abused its discretion in completely denying Plaintiffs' request for a preliminary injunction requiring additional interim actions by Defendants to block the movement of invasive Asian carp through the Chicago Area Waterway System into Lake Michigan.......22

    A.  Standard of Review ...........................................................22

    B.  Analysis .........................................................................23

1. The district court erred in holding that Plaintiffs failed to show a sufficient likelihood of success on the merits of their substantive claims.................................................................................................24

    a. Common law public nuisance ..................................................... 25

        (1) The district court legally erred in holding that Plaintiffs were required to show imminent harm as an element of their common law public nuisance claim. ..........................25

        (2) The evidence showed a substantial likelihood that Plaintiffs will succeed on the merits of their common law public nuisance claim.  The district court's contrary holding is based not only on a legally erroneous standard, but a series of clearly erroneous factual findings. ............................................................................27

        (3) The district court committed further legal error in concluding that the traditional reluctance of a court to enjoin as a public nuisance conduct authorized by law or regulation should be applied here to bar Plaintiffs' nuisance claim..................................................................28

    b. Administrative Procedures Act ................................................... 31

2. Viewed in its entirety, the record shows that Plaintiffs will likely suffer irreparable injury if a self-sustaining Asian carp population is established in the Great Lakes and that establishment of such a population is both likely and imminent if additional interim measures to block the invasion are not taken now. ...............................................................................................35

    a. The characteristics of Asian carp and their history in the U.S. waterways support their likely establishment in the Great Lakes if their migration through the CAWS is not stopped immediately.................................................................................. 36

    b. Well-established biological principles show that Asian carp are likely to become established well before the resulting damage is apparent, and the threshold of an invasion is a critical juncture at which preventative action is urgently needed. ....................................................................................... 37

c.   Even extensive netting and electrofishing detect only a small fraction – as little as one percent – of Asian carp present in the CAWS. ................................................................. 40

d.   The scientific evidence, including, but not limited to the unrebutted testimony of Dr. Lodge shows that a positive eDNA detection likely represents the recent presence of at least one Asian carp. ................................................. 45

e.   Contrary to the district court's findings, the "small" number of Asian carp in the CAWS – even if less than 100 – presents an imminent risk of Asian carp invasion and establishment in the Great Lakes. ....................................................... 47

f.   Contrary to the district court's findings, there is evidence in the record that the electrical barrier system has failed to prevent Asian carp from entering the CAWS and Lake Michigan. ................................................................. 51

g.   Contrary to the district court's findings, the scientific evidence in the record shows that the Great Lakes ecosystem will support the establishment of self-sustaining populations of Asian carp. ............................................................. 55

h.   The Corps has admitted, and the evidence shows that if Asian carp become established in the Great Lakes, Plaintiffs and other users of the Great Lakes will likely suffer irreparable harm. ...................................................... 58

3.   Even if the interim control measures requested by Plaintiffs will cause some temporary localized economic harm, the facts confirm that the balance of harms tips decidedly in favor of Plaintiffs who will incur long term irreparable harm to the environment and to their economies spread throughout the entire Great Lakes region if a self-sustaining population of Asian carp becomes established in the Great Lakes. ...........................................60

a.   The record evidence easily satisfies the reduced showing of relative harms applicable here. .................................. 61

b.   Any concerns arising from potential flooding are moot; Plaintiffs' proposed injunction would allow opening of the

locks and sluice gates — consistent with current practices — when necessary to avoid flooding. .............................................. 62

c.  Defendants presented no evidence, other than of some increased costs, that rebuts the assertion that police, fire, maritime and homeland security issues can be adequately addressed through careful planning. ........................................... 67

d.  The Defendants' estimates regarding the economic impact of the injunctive relief sought by Plaintiffs are seriously overstated. .................................................................. 69

II.  This Court should enter requested injunctive relief where the district court committed reversible error when it failed to make the mandatory Fed. R. Civ. P. 52(a)(2) findings and conclusions concerning Plaintiffs' request for an injunction requiring the Corps to expedite the preparation of a feasibility study of options for the permanent physical separation of the CAWS from Lake Michigan................................................................73

A.  The standard of review is *de novo*..........................................................73

B.  The evidentiary record supports entry by this Court of a preliminary injunction accelerating the feasibility study...........................................75

1.  The Court has authority to enter its own injunction. ........................75

2.  Given the magnitude of the irreparable injury if Asian carp enter the Great Lakes, the likelihood that Plaintiffs will be granted relief on their claims, the recognition by Congress that a feasibility study must be done and the lack of harm to the public interest or to Defendants from accelerating such a study, this Court should enter a preliminary injunction requiring acceleration of the feasibility study..................................................76

a.  Plaintiffs are likely to succeed on the merits of their claims..... 77

b.  If the feasibility study is not accelerated, Plaintiffs will suffer irreparable harm. ...................................................... 78

c.  Any harm to the public interest or to Defendants caused by acceleration of the feasibility study is insignificant................... 81

Conclusion ..............................................................................84

Addendum – relevant statutes ................................................................87

Certificate ...................................................................................... 116

Circuit Rule 31(e)(1) Certification........................................................ 117

Proof of Service .............................................................................. 118

Circuit Rule 30(d) Statement ............................................................. 120

Plaintiffs-Appellants' Short Appendix

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                  **<u>Page</u>**

*Amoco Production Co. v. Gambell*,
    480 U.S. 531 (1987) ................................................................73

*Anderson v. U.S.F. Logistics (IMC), Inc.*,
    274 F.3d 470 (7th Cir. 2001) ......................................................2

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
    757 F.2d 523 (2d Cir. 1985) ....................................................59

*Brown v. Quinlan, Inc.*,
    138 F.2d 228 (7th Cir. 1943) ...................................................75

*Carmichael v. Basler Turbo Conversions, Inc.*,
    1992 U.S. App. LEXIS 1128 (7th Cir. 1992)............................... 74, 75

*Chapman v. Maytag Corp. (In re Chapman)*,
    297 F.3d 682, 689 (7th Cir. 2002)............................................74

*Conair v. Automatik ApparateMaschinenbau*,
    944 F.2d 862 (Fed. Cir. 1991) ............................................ 74, 75

*Donovan v. Robbins*,
    752 F.2d 1170 (7th Cir. 1985)................................................74

*Enquip, Inc. v. Smith-McDonald Corp.*,
    655 F.2d 115 (7th Cir. 1981) ..................................................59

*Freedom Nat'l Bank v. Northern Ill. Corp.*,
    202 F.2d 601 (7th Cir. 1953) ..................................................59

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of*
    *the United States of America, Inc.,*
    549 F.3d 1079 (7th Cir. 2008)............................................ 22, 61, 76

*Illinois v. Milwaukee*,
    599 F.2d 151 (7th Cir. 1979) (overruled on other grounds)......................... 26, 27

*Keller v. United States*,
    58 F.3d 1194 (7th Cir. 1995) ..................................................59

*Lawson Products, Inc. v. Arnet, Inc.*,
     782 F.2d 1429 (7th Cir. 1986) ............................................................ 22, 23, 75

*Mayo v. Lakeland Highlands Canning Co.*,
     309 U.S. 310 (1940) ...................................................................................75

*Meridian Mut. Ins. Co. v. Meridian Ins. Group*,
     128 F.3d 1111 (7th Cir. 1997). ..................................................................76

*New England Legal Found. v. Costle*,
     666 F.2d 30 (2d Cir. 1981) .........................................................................28

*Olson v. Paine, Webber, Jackson & Curtis, Inc.*,
     806 F.2d 731 (7th Cir. 1986) .......................................................................2

*Schott Motorcycle Supply, Inc. v. American Honda Motor Co.*,
     976 F.2d 58 (1st Cir. 1992) .........................................................................59

*Soo Line R.R. v. St. Louis S.W. Ry.*,
     125 F.3d 481 (7th Cir. 1997) .......................................................................59

*State of North Carolina v. Tennessee Valley Authority*,
     615 F.3d 29 (4th Cir. 2010) .........................................................................28

*Tober v. Graco Children's Prods.*,
     431 F.3d 572 (7th Cir. 2005) .......................................................................74

*Young & Vann Supply Co. v. Gulf, F. & A. Ry. Co.*,
     5 F.2d 421 (5th Cir. 1925) ...........................................................................59

*Zepeda v. INS*,
     753 F.2d 719 (9th Cir. 1983) .......................................................................75

## **Statutes**

5 U.S.C. § 551(13) ...........................................................................................31

5 U.S.C. § 701 *et. seq.* .................................................................................. 1, 25

5 U.S.C. § 702 ........................................................................................... 1, 25, 31

5 U.S.C. § 706 ..................................................................................................25

5 U.S.C. § 706(1) ............................................................................................31

5 U.S.C. § 706(2) ....................................................................................31

16 U.S.C. § 4722(i)(3) ...................................................................... 29, 30

28 U.S.C. § 1292(a)(1).............................................................................2

28 U.S.C. § 1331 ......................................................................................1

28 U.S.C. § 1332 ......................................................................................1

## **Other Authorities**

Act of Dec. 4, 1981, Pub. L. No. 97-88, § 107, 95 Stat. 1135.................................29

Act of July 30, 1983, Tit. I, Ch. IV, 97 Stat. 301 ....................................29

Energy and Water Development and Related Agencies Appropriations Act
    of 2010; Pub. L. No. 111-85, 123 Stat. 2845, § 126 ...................................... 30, 83

Moore's Federal Practice, Civil § 203.10....................................................3

RESTATEMENT (SECOND) OF TORTS § 821B(1)....................................... 25, 26, 27, 28

River and Harbors Act of 1946, Pub. L. No. 79-525, 60 Stat. 634 (July
    24,1946)..........................................................................................29

Water Resources Development Act of 2007 (WRDA), Pub.L. No. 110-114,
    121 Stat. 1041, § 3061(d) ........................................................ 29, 30, 77, 82

## **Rules**

Fed. R. App. P. 4(a)(1)(B) ........................................................................4

Fed. R. Civ. P. 52(a)........................................................................ 21, 22

Fed. R. Civ. P. 52(a)(2)......................................................................73, 74

Fed. R. Civ. P. 52(a)(6)............................................................................22

Seventh Circuit Rule 28(a)........................................................................3

## JURISDICTIONAL STATEMENT

### 1.    Statement Concerning the District Court's Jurisdiction

As alleged in paragraph 2 of the Complaint (Dkt. #1), there are two bases for the district court's jurisdiction.  First, the district court has federal question jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702 as this is a civil action seeking injunctive and declaratory relief pursuant to the Administrative Procedures Act (APA), 5 U.S.C. § 701 *et. seq.*, and the federal common law of public nuisance.

In addition, the district court has diversity of citizenship jurisdiction under 28 U.S.C. § 1332, as this is a civil action where the matter in controversy exceeds the value of $75,000 and is between the Plaintiff States and Intervenor-Plaintiff Grand Traverse Band of Ottawa and Chippewa Indians (GTB), an Indian tribe having a government-to-government relationship with the United States, and the Defendant the Metropolitan Water Reclamation District of Greater Chicago (District) and Intervenor-Defendant the City of Chicago (City), both Illinois units of local government, Intervenor-Defendant Wendella Sightseeing Company, Inc. (Wendella), a corporation which is incorporated and has its principal place of business in Illinois, and Intervenor-Defendant Coalition to Save Our Waterways (Coalition), an unincorporated association whose members Appellants believe to be citizens of Illinois.

1

## 2.     Statement Concerning Appellate Jurisdiction

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1), which

provides in relevant part:

(a)  Except as provided in subsection (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

(1)  Interlocutory orders of the district courts of the United States . . . or of the judges thereof, granting, continuing, modifying, *refusing* or dissolving *injunctions*, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court. [Emphasis added.]

The Order of the district court appealed here that denied, in its entirety,

Plaintiffs' motion for preliminary injunction, (S.App. 61),[1] both in form and

substance, is an "interlocutory order . . . refusing . . . [an] injunction . . . " within

the meaning of 28 U.S.C. § 1292(a)(1).

Under the plain language of 28 U.S.C. § 1292(a)(1), such an order denying a

preliminary injunction is immediately appealable by right.  This Court has

recognized that it has jurisdiction under 28 U.S.C. § 1292(a)(1) to hear an appeal

from a district court order denying a motion for preliminary injunction.[2]

Commentators have also recognized that an interlocutory district court order that

---

[1] "S.App." refers to the Short Appendix attached to this Brief.  "App." refers to Plaintiffs' separate Appendix.  Unless otherwise noted, "Tr." refers to the September 7-10, 2010 evidentiary hearing transcript.

[2] *See, e.g. Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 474 (7th Cir. 2001); *Olson v. Paine, Webber, Jackson & Curtis, Inc.*, 806 F.2d 731, 734 (7th Cir. 1986).

expressly denies a motion for a preliminary injunction is generally appealable under § 1292(a)(1), absent a specific statutory provision barring interlocutory appeals in certain cases.[3]  No specific statute bars an interlocutory appeal under the circumstances of this case.

Finally, consistent with the requirements of Seventh Circuit Rule 28(a), Plaintiffs note, as reflected in paragraph 3 of the request for relief in Plaintiffs' Complaint, that the following issues remain to be determined in the district court: (a) Plaintiffs' requests for declaratory judgment that to the extent that the conditions and facilities constructed, maintained and operated by the Corps and the District will allow the migration of Asian carp into Lake Michigan, those conditions and facilities constitute a public nuisance or are otherwise unlawful, and (b) Plaintiffs' request for a permanent injunction requiring the Corps to develop and implement plans to permanently separate the Asian carp-infested waters of the Illinois River basin and the Chicago Area Waterway System (CAWS) from Lake Michigan to prevent the migration of Asian carp or other harmful aquatic invasive species into Lake Michigan.  (Dkt. #1, Complaint, pp. 33-34.)

The district court issued its Opinion and Order denying Plaintiffs' Motion for Preliminary Injunction on December 2, 2010.  The Notice of Appeal was timely filed with the district court clerk on December 16, 2010.  Under Fed. R. App. P.

---

[3] *See, e.g.* Moore's Federal Practice, Civil § 203.10.

4(a)(1)(B), when the United States or a federal agency is a party, the notice of appeal may be filed by any party within 60 days after the judgment or order appealed from is entered.

## STATEMENT OF ISSUES PRESENTED

I.     Defendants created and maintain facilities in the Chicago Area Waterway System through which highly injurious Asian carp imminently threaten to invade the Great Lakes.  Paragraph 1 of the relief requested in Plaintiffs' motion for preliminary injunction sought immediate, interim measures to block the invasion.  Where the district court relied upon erroneous legal standards and clearly erroneous findings of fact, did it abuse its discretion in denying that part of the injunction?

II.    Defendant U. S. Army Corps of Engineers is delaying, until at least 2015, a congressionally authorized feasibility study of options for a permanent solution preventing the transfer of Asian carp and other invasive species between the Mississippi and Great Lakes basins.  Paragraph 2 of the relief requested in Plaintiffs' motion sought to accelerate the relevant portion of the study so that information needed to reliably prevent the invasion will be timely developed.  Did the district court commit legal error by failing to consider and make findings and conclusions regarding Paragraph 2?

## STATEMENT OF THE CASE

Plaintiffs-Appellants, the States of Michigan, Wisconsin, Minnesota, and Ohio, and the Commonwealth of Pennsylvania (Plaintiffs) brought this action on July 19, 2010 in the U. S. District Court for the Northern District of Illinois alleging counts of common law public nuisance against both the United States Army Corps of Engineers (Corps) and the District, and a second count for violations of the federal APA against the Corps.  Plaintiffs allege that the Corps' and the District's current operation of facilities in the CAWS, in a manner that allows invasive fish species – Asian carp – to enter the Great Lakes, constitutes a common law public nuisance and that the Corps has made a series of unlawful, arbitrary and capricious decisions regarding its facilities that are subject to review under the APA.

Along with their Complaint, on July 19, 2010, Plaintiffs filed a Motion for Preliminary Injunction that sought two forms of mandatory injunctive relief.  First, Plaintiffs requested an order requiring both the Corps and the District to take a series of immediate measures, including but not limited to, temporary closure of locks and placement of physical barriers to fish passage in sluice gates used to control water levels, in order to prevent the movement of Asian carp into Lake Michigan.  Second, Plaintiffs sought a preliminary injunction requiring the Corps to expedite the preparation of a congressionally authorized feasibility study of

6

options for permanently preventing the transfer of Asian carp between the Mississippi River and Great Lakes basins.

Several parties sought and obtained intervention. On August 20, 2010, the motions of the City, the Coalition and Wendella to intervene as Defendants were granted. (Dkt. #101.) On December 2, 2010, the court granted the motion of GTB to intervene as Plaintiff. (Dkt. #156.)

The Court heard oral argument on the preliminary injunction motion on August 23, 2010. An evidentiary hearing was conducted by the court on September 7, 8 and 10, 2010. Briefs and extensive supporting affidavits and documents were filed by the various parties both before and after the hearing. The court heard additional oral argument on October 18, 2010. In a Memorandum Opinion and Order entered on December 2, 2010, the district court denied Plaintiffs' Motion for Preliminary Injunction without exception. This is an appeal of that interlocutory Order.

## STATEMENT OF FACTS

The district court succinctly summarized the subject of the underlying

litigation as follows:

> This litigation involves the Chicago Area Waterway System
> ("CAWS"), a system of man-made canals and natural waterways that
> serves as both a navigation link between Lake Michigan and the
> Mississippi River system and an outlet for the storm water and
> effluent of the City of Chicago.  Plaintiffs are concerned about the
> spread of invasive silver and bighead carp ("Asian carp") through the
> CAWS into Lake Michigan. Defendants, the United States Army
> Corps of Engineers ("Corps") and the Metropolitan Water
> Reclamation District of Greater Chicago ("District"), have created,
> maintained, and continue to operate and control facilities within the
> CAWS that link Illinois waters to Lake Michigan and other connected
> waters.  (S.App. 1.)

Section I of the district court's December 2, 2010 Opinion (S.App. 4-23)

extensively reviews and summarizes many of the background facts and the

positions of the parties relevant to the issues presented on appeal.  Plaintiffs

respectfully refer this Court to that recitation of facts, subject to the additions and

corrections noted below.

## I.    Chicago Area Waterway System (CAWS)

The CAWS is a system of artificial and modified natural waterways more

than 70 miles long (App. 66, 235; Tr. 505) that hydraulically connect the Illinois

and Des Plaines Rivers to Lake Michigan at five points in Illinois and Indiana.

(App. 62.)  The Wilmette Pumping Station is owned, operated and maintained by

the District and includes a concrete channel, pumps and a sluice gate.  (App. 64.)

The Chicago River and Controlling Works include a concrete wall separating the
Chicago River from Lake Michigan, sluice gates and a navigation lock.  (App. 63.)
The Corps is responsible for the maintenance and operation of the Lock.  It has
closed the Lock between October 1, 2010 and April 15, 2011 for maintenance.
(S.App. 56; App. 324; Tr. 364-365.)  The District is responsible for the remainder
of the structure and the sluice gates.  (S.App. 5; App. 64.)  The Corps controls the
Thomas J. O'Brien Lock and Dam (S.App. 5; App. 64.) and operates the sluice
gates under the direction of the District.  The Corps has acknowledged that the
O'Brien lock is "significantly degrad[ed]" and has developed, but not yet
implemented, plans to close it for repairs.  (App. 384-385.)

Because of the creation and operation of the CAWS by the District and the
Corps, fish can migrate from the CAWS into Lake Michigan as a result of:  (1)
reversals of water flow into Lake Michigan at the Wilmette Pumping Station under
certain stormwater flow conditions (App. 289-290.); (2) direct passage through the
Grand Calumet River into Lake Michigan at Indiana Harbor, if and when a
temporary cofferdam recently installed as part of an ongoing environmental
cleanup project at the Harbor is removed ; and (3) direct passage through the Little
Calumet River, where no barriers exist, into Lake Michigan at Burns Harbor,
Indiana.  (App. 127.)

Thus, as the district court found, "[t]he CAWS and its assorted structures, as currently maintained and operated by the District and the Corps, provide a potential conduit for the movement of fish and other biota, including Asian carp, between the Illinois River and Lake Michigan at multiple locations."  (S.App. 5-6.)

## II.    Asian carp

As the district court noted (S.App. 6-7), federal and state agencies have acknowledged that potential Asian carp migration through the CAWS into Lake Michigan poses "the greatest immediate threat to the Great Lakes ecosystem . . . " [United States Fish and Wildlife Service] and "could have a devastating effect on the Great Lakes ecosystem and significant economic impact on the $7 billion fishery."  [Illinois Department of Natural Resources.]  Indeed, the Corps stated in 2009 that "the prevention of an interbasin transfer of bighead and silver carp from the Illinois River to Lake Michigan is paramount in avoiding ecological and economic disaster."  (S.App. 6-7.)  The enormous harm that Asian carp could cause in the Great Lakes is further described in the Affidavit of Tammy Newcomb, Ph.D., an expert in fisheries biology in the Michigan Department of Natural Resources and Environment.  (App. 118-126.)

## III.   The Corps' Electrical Barrier System

Because of the long recognized potential for aquatic invasive species to move through the CAWS, in either direction, between the Mississippi and Great Lakes basins, Congress first authorized the Corps to carry out a dispersal barrier demonstration project in 1996.  (S.App. 8.)  The Corps designed and in 2002 began operating an initial electrical "barrier," (now designated I) relying on an electrical field created in the water by running direct current through steel cables attached to the bottom of the canal.  The electrical field is intended to deter the passage of fish.  (S.App. 8, 15.)  A second electrical barrier, designated IIA, began testing in 2006, and regular operation in 2009.  (S.App. 15.)  A third barrier, IIB, is under construction.  (S.App. 15.)  All three barriers are located near Lockport, at the southern terminus of the CAWS.  (App. 62.)

Despite its admission that this is a "temporary experimental fix" (App. 197), the Corps continues to rely upon the electrical barrier system as the "most important piece" of its defense against the migration of Asian carp into the CAWS and Lake Michigan.  (Tr. 300.)

## IV.   Evidence of Asian carp approaching and entering the CAWS

In 2008, the Corps entered into a cooperative agreement with the Center for Aquatic Conservation at the University of Notre Dame, headed by Dr. David Lodge, a leading expert in the biology of invasive species, to assist the Corps in an

aquatic invasive species risk assessment. (Tr. 20-21.) At the time, it was widely assumed that the northward advance of Asian carp through Illinois waterways had "stalled" a considerable distance south of the CAWS and the barrier systems. (Tr. 25, 28.) But statistical analysis exhibiting fish observations by Dr. Lodge and his colleagues indicated that Asian carp had likely spread further northward. (Tr. 25-29; App. 65.)

Dr. Lodge and his team then assisted the Corps in developing a more sensitive method to detect the presence of the Asian carp along the "invasion front" where by definition they are relatively rare and unlikely to be captured using traditional fisheries surveillance tools such as netting and electrofishing. (App 72-73.) They adapted and improved existing methods for indirectly detecting organisms by recovering species-specific DNA released into the environment. (App. 74-76, 144-148.) In this environmental DNA (eDNA) method, samples of water are collected, filtered and then analyzed for the presence of genetic material secreted by the target species – bighead and silver carp. (S.App. 11-12, App. 146-147.) The methods and techniques were validated by an independent audit team from the U.S. EPA. (S.App. 11, 12; App. 148-149.)

A series of eDNA samples collected in 2009 indicated that Asian carp were present not only below, but above (northward) of the barrier system, and in the CAWS itself. (App. 153-154.) Further sampling in the CAWS through May 2010

12

resulted in 60 positive detections for Asian carp DNA in the CAWS, above the barrier, including samples in Calumet Harbor and at the mouth of the Chicago River. (App. 66-68.)

In addition, one bighead carp body was recovered just south of the barrier system in December 2009 when a 5.7 mile segment of the canal was treated with rotenone (a fish poison) while the barrier system was shut down for maintenance. (S.App 12; Tr. 67.) A live bighead carp was recovered in a netting operation in Lake Calumet, north of the O'Brien Lock and less than 6 miles from Lake Michigan, in June 2010 (App. 69; Tr. 67-68.)

## V.    Plaintiffs' requests for relief

In the face of increasing evidence of Asian carp presence in the CAWS, the Plaintiff States, beginning in December 2009, repeatedly requested the Corps, the District and Illinois authorities to take immediate, effective, comprehensive measures to block the migration of Asian carp into Lake Michigan. (S.App. 21.) The requested actions mirror the relief sought by Plaintiffs in the underlying lawsuit: (1) using all available interim measures, consistent with protection of public health and safety to physically prevent Asian carp from entering the Lake, including, but not limited to temporarily closing the locks, and placing barriers in sluice gates; and (2) expediting planning and implemention of a permanent solution, i.e., physical separation of the basins at strategic points in the CAWS.

13

## VI.    District Court litigation

After the Corps and the District failed to implement the additional requested measures, Plaintiffs filed the underlying action.  Plaintiffs concurrently filed a motion for preliminary injunction:  (a) requiring both Defendants to take interim measures to block the migration of Asian carp through the CAWS; and (b) requiring the Corps to expedite the feasibility study (Dkt. # 9, pp. 2-4.)

Plaintiffs' motion and brief were supported by a series of exhibits, including affidavits of Dr. Newcomb (App. 118-139), and John C. Taylor, Ph.D., of Wayne State University, an expert in transportation and logistics.  (App. 125-281.)  Dr. Taylor detailed his review and analysis of transportation-related aspects associated with the temporary lock closure proposed by Plaintiffs.

The principal Defendants and each of the Intervening Defendants filed extensive briefs and evidentiary submissions, including multiple declarations and affidavits in their respective oppositions to Plaintiffs' motion.  The court heard initial oral argument on the preliminary injunction motion on August 23, 2010.

An evidentiary hearing was then conducted on September 7, 8 and 10, 2010. Because the district court had emphasized that it had carefully read the parties' affidavits and declarations, and requested that the parties not call their affiants as witnesses merely to repeat their written testimony, and in the intent of expediting the proceeding, Plaintiffs did not present live testimony by Drs. Newcomb and

14

Taylor.  (App. 329; Tr. 14-15.)  Plaintiffs did subpoena Dr. Lodge, who has never been retained by Plaintiffs as a witness (Tr. 18), to testify regarding issues relevant to the case, including developments that had occurred after he prepared a declaration filed by the United States in the related Supreme Court proceeding. (App. 140-164.)

The following witnesses testified at the evidentiary hearing.

Dr. David Lodge is a full professor at the University of Notre Dame.  (App. 141.)  He is a biologist who has done extensive research over the years regarding invasive species and who has published at least 150 peer reviewed articles in professional journals.  (App. 141.)  He and his team were hired by the Corps in 2008 to conduct assessments of the risk of invasive species moving through the CAWS, including Asian carp.  (App. 142.)  Dr. Lodge testified, among other things, that as a result of his research, including his use of eDNA testing of the waters in the CAWS, he believed that there is "a very urgent and imminent risk of invasion" of the Great Lakes by Asian carp.  (App. 88.)

Major General John Peabody submitted a written declaration, and gave live testimony at the request of the Corps.  General Peabody commands the Corps' Great Lakes and Ohio River Division.  (Tr. 213.)  General Peabody gave general testimony regarding the Corps' role in trying to stop the advance of the Asian carp, including operation of the electric barrier.

15

Dr. Gentile Ficetola also had filed a written declaration. He testified at the request of Wendella via a teleconference connection from Milan, Italy, at times using an interpreter. (Tr. 231.) He testified that his area of expertise is conservation biology and discovery of invasive species. (Tr. 233-234.) He published the first paper describing the use of eDNA in water bodies to establish the existence of species, in that case bullfrogs in ponds. He gave general testimony regarding this technique, his review of Dr. Lodge's declaration, and his understanding of "short" strands of eDNA.

Mr. Duane Chapman testified on behalf of the Corps, which had previously submitted a declaration for him as well. (App. 165-182.) Mr. Chapman is employed as a research biologist by the U.S. Geological Survey. (App. 165.) He has done extensive research and writing concerning Asian carp. (App. 165-166.) He testified regarding Asian carp biology and habitat, as well as the limitations of conventional sampling techniques for catching Asian carp.

Mr. Charles Wooley filed a declaration and gave live testimony at the hearing. He is the deputy regional director for the United States Fish and Wildlife Service (USFWS). (App. 374.) He generally testified regarding the efforts of the federal government to monitor and control Asian carp in the CAWS as well as the Risk Assessment Panel convened by the USFWS at the request of the Corps. (App. 381.)

Mr. Michael Cox gave both written and live testimony at the hearing. Mr. Cox is the assistant to the chief of operations division in the Corps' Rock Island District. (Tr. 535.) He generally testified regarding maintenance activities on the Chicago and O'Brien locks.

Dr. Tzuoh-Ying Su is employed by the Corps as a hydraulic engineer. Dr. Su testified regarding water levels in the CAWS. Among other things, he indicated that the locks sometimes had to be opened to relieve flood waters in the CAWS, but that this had only happened a total of nine times in the past 50 years. (App. 392.)

Mr. Edward Staudacher, who had filed a prior declaration, was called as a witness by the District. He testified that he had a bachelor's degree in engineering, and that he had his Juris Doctorate. (Tr. 578.) He was employed by the District as a supervising civil engineer in charge of the waterways. (Tr. 579.) He generally testified regarding operation of the sluice gates at the Chicago Controlling Works, including installation of screens on some of those gates.

Dr. Joseph Schwieterman is a professor in the School of Public Service at DePaul University and director of the Chaddick Institute for Metropolitan Development. He was called to testify on behalf of the Coalition. He testified regarding his opinion as to the economic impact from the requested preliminary injunction.

17

After the submission of post-hearing memoranda by all parties, the court heard additional oral argument on October 18, 2010.

On December 2, 2010, the court issued its Memorandum Opinion and Order denying Plaintiffs' Motion, from which Plaintiffs now appeal.

## SUMMARY OF ARGUMENT

The States, Canadian provinces and tribes bordering the Great lakes, and everyone that uses this ecosystem for recreation or commerce face a dire threat. Two highly injurious species of Asian carp – the bighead and the silver[4] – have relentlessly spread up the Mississippi River Basin drastically disrupting existing fisheries and public recreation. Having infested Illinois rivers, Asian carp are now poised to invade Lake Michigan through the CAWS – a system of artificial and natural channels – the key infrastructure of which was created and is maintained by the Corps and the District.

Plaintiffs, five sovereign states[5] who hold navigable waters and resources of the Great Lakes ecosystem in public trust for their respective citizens, brought the underlying action against the Corps and the District to abate a common law public nuisance and for judicial review of unlawful actions by the Corps. Plaintiffs moved for a preliminary injunction (1) requiring both Defendants to take a series

---

[4] Collectively referred to in the lower court and this brief as "Asian carp."
[5] The GTB intervened as a Plaintiff in the action after the commencement of the preliminary injunction proceedings that are the subject of this appeal.

of interim measures to block the movement of Asian carp through the CAWS into the Great Lakes; and (2) requiring the Corps to expedite a congressionally authorized study of options for permanently preventing the transfer of invasive species – including Asian carp – between the Mississippi and Great Lakes basins.

On December 2, 2010, the district court denied Plaintiffs' motion.  As outlined below, the decision should be reversed, and Plaintiffs' motion for preliminary injunction granted for two reasons.

First, while the court did extensively consider the first part of Plaintiffs' motion and correctly identified the four overall factors it was required to analyze, it abused its discretion in denying the requested preliminary injunction on the record before it.  The court erroneously found that Plaintiffs had shown only a "minimal" or "very modest" likelihood of success on the merits of their substantive claims.  In that regard, it legally erred by holding that: (a) imminent, as opposed to merely "threatened" harm was a necessary element of Plaintiffs' common law nuisance claim, and (b) the Corps' activities had been considered and approved by Congress and therefore should not be enjoined as a common law nuisance.

Moreover, the court's conclusions regarding both likelihood of success on the merits and the likelihood of imminent and irreparable harm were based upon a series of clearly erroneous findings of fact.  Among other things, the court clearly, and materially erred in selectively considering the record and finding:  (a) "no"

19

evidence that the electrical barrier system used by the Corps to deter Asian carp had been breached nor that the carp had entered Lake Michigan, (b) the state of eDNA science does not permit a reasonable inference that live Asian carp were present in the CAWS past the barriers in sufficient numbers to present an imminent threat to establish a breeding population, (c) that the number of Asian carp above the barriers are effectively being assessed, and (d) it is unknown whether Asian carp can survive and reproduce in Lake Michigan.

Contrary to the court's findings, Plaintiffs showed, on the record as a whole, a substantial likelihood of success on the merits and that absent the requested preliminary injunctive relief, there is an imminent risk that Asian carp will invade and establish a reproducing population in the Great Lakes and thereby cause grave and irreparable harm.

The court also erred in assessing the balance of harms and impact on the public. The record supports Plaintiffs' contentions that the relief requested by Plaintiffs would not endanger public health or safety. On the contrary, the Plaintiffs' proposed injunction carefully ensures that the interim barriers to fish passage they propose - including screens in sluice gates, bulkheads in locks, and block nets in the Little Calumet River - could be cleaned, opened, or removed when determined necessary by the District and the Corps to prevent flooding or other threats to public safety. In that regard, the relief requested by Plaintiffs

would rely upon measures and procedures comparable to those currently being used by the local and federal agencies while the Chicago Lock is closed between October 2010 and April 2011 for maintenance purposes.  Finally, the likely permanent and regional harm to the Great Lakes and its fisheries (with an estimated annual value of $7 billion) resulting from the establishment of Asian carp, substantially outweighs the temporary and localized economic costs associated with the disruption of some navigation in the CAWS.  Accordingly, this Court should reverse the district court decision denying the first part of Plaintiffs' preliminary injunction motion.

Second, the district court committed legal error by failing to even address the substance of the second part of Plaintiffs' motion seeking a preliminary injunction requiring the Corps to accelerate the feasibility study of options for a permanent solution to the threat of invasive species transfer through the CAWS.  In failing to do so, the district court violated its non-discretionary duty under Fed. R. Civ. P. 52(a) to make findings of fact and conclusions of law pertaining to its refusal of the preliminary injunction.

Where, as here, the record contains sufficient information for this Court to make the requisite findings and conclusions, the Court can, and should, apply the established four-factor analysis for preliminary injunction, and grant paragraph 2 of the relief requested in Plaintiffs' motion.

21

# ARGUMENT

I.    **The district court committed legal error, relied upon clearly erroneous findings of fact and abused its discretion in completely denying Plaintiffs' request for a preliminary injunction requiring additional interim actions by Defendants to block the movement of invasive Asian carp through the Chicago Area Waterway System into Lake Michigan.**

## A.    Standard of Review

In considering a district court order granting or denying a preliminary injunction, this Court reviews the lower court's factual determinations under a clearly erroneous standard, while the necessary legal conclusions are given *de novo* review.[6]  While the district court's ultimate decision on the preliminary injunction is reviewed for an abuse of discretion, and its balancing of the equitable factors is given substantial deference, a district court abuses its discretion when it commits a clear error of fact or an error of law in its analysis of the preliminary injunction motion.[7]

Under Rule 52(a)(2) of the Federal Rules of Civil Procedure, in granting or refusing an interlocutory injunction, the district court must state the findings of fact and conclusions of law that support its actions.  Such findings of fact "must not be set aside unless clearly erroneous."[8]  But "the appellate role is not to rubber stamp the lower court's determination" and "there is an obligation under *Rule 52(a)* to

---

[6] *Lawson Products, Inc. v. Arnet, Inc.,* 782 F.2d 1429, 1437 (7th Cir. 1986).
[7] *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.,* 549 F.3d 1079, 1086 (7th Cir. 2008); *Lawson Prods.,* 782 F.2d at 1437.
[8] Fed. R. Civ. P. 52(a)(6).

engage in a comprehensive review of the . . . evidence to determine if clear error has been committed."[9]

## B.    Analysis

At the outset of its analysis, the district court correctly noted that a mandatory preliminary injunction is an extraordinary remedy and entails a two-stage inquiry.  (S.App. 22-24.)  First,

> A party seeking a preliminary injunction must demonstrate as a threshold matter that (1) its case has some likelihood of succeeding on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if preliminary relief is denied.  *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir. 1992). . . . the moving party must "demonstrate that irreparable harm is *likely* in the absence of an injunction," and that the mere "possibility" of irreparable harm will not suffice.  *Winter v. Natural Resources Defense Council,* 129 S. Ct. 365, 375-76 (2008) (emphasis in original).

Second,

> If the moving party meets its initial burden, then a court must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm that the moving party will suffer if relief is denied. *Storck USA, L.P. v. Farley Candy Co.,* 14 F.3d 311, 314 (7th Cir. 1994).  The court also considers the public interest served by granting or denying the relief, including the effects of the relief on non-parties. *Id.*; . . . The court weighs all of these factors, "sitting as would a chancellor in equity" (*Abbott,* 971 F.2d at 12) and applying a "sliding scale" approach, under which "the more likely plaintiff will succeed on the merits, the less the balance of irreparable harms need favor plaintiff's position" (*Ty, Inc. v. The Jones Group*, 237 F.3d 891, 895 (7th Cir. 2001)).

---

[9] *Lawson Prods.,* 782 F.2d at 1439-1440 [citation omitted].

While the district court's initial recitation of these standards for a preliminary injunction is unobjectionable, the court then made a series of legal and clear factual errors in applying them to Plaintiffs' request for an order requiring the Corps and the District to take a series of additional, interim means to prevent Asian carp from entering Lake Michigan.  As outlined below, these legal and factual errors led the court to wrongly conclude that:  (a) Plaintiffs had not shown a sufficient likelihood of success on the merits of their substantive claims (S.App. 4); (b) Plaintiffs were not likely to suffer imminent and irreparable harm in the absence of the requested injunctive relief (S.App. 43-54); and (c) the balance of harms and the impact on the public interest weighed against Plaintiffs.  (S.App. 60-61.)

> **1.    The district court erred in holding that Plaintiffs failed to show a sufficient likelihood of success on the merits of their substantive claims.**

Plaintiffs' underlying Complaint pled two claims for declaratory and injunctive relief.  Count I is based on the federal common law of public nuisance. It alleges that the Corps and the District are maintaining a public nuisance, by establishing, operating and maintaining facilities and conditions in the CAWS in a manner that allows injurious Asian carp to enter Lake Michigan and connected waters where they are likely to establish reproducing populations and unreasonably interfere with public rights and uses of those resources.  (Dkt. #1; Complaint, pp.

26-28.)  The Plaintiff states seek declaratory and injunctive relief to prevent and abate the threatened injury to public rights.

Count II is based on the APA.[10]  It alleges that the Corps has, in several respects, acted unlawfully, or failed to act in accordance with the law, with respect to the threatened migration of Asian carp through the CAWS into Lake Michigan and connected waters.  It seeks judicial review of the Corps' unlawful agency action under 5 U.S.C. §§ 702 and 706.  (Dkt. #1; Complaint, pp. 29-31.)

### a.    Common law public nuisance

The district court's finding that Plaintiffs demonstrated "at best, a very modest likelihood of success on their public nuisance claims" (S.App. 39)[11] is legally and factually unjustified in at least three respects.

### (1)    The district court legally erred in holding that Plaintiffs were required to show imminent harm as an element of their common law public nuisance claim.

At common law, "[a] public nuisance is an unreasonable interference with a right common to the general public."[12]  The district court correctly noted (S.App.

---

[10] 5 U.S.C. § 701, *et seq.*

[11] As discussed below, that finding, and a similar finding that Plaintiffs had shown only a "minimal" likelihood of success on the merits of their APA claim (S.App. 28) led the court to demand an even stronger showing of likely irreparable harm than would legally be required.  (S.App. 28, 43.)

[12] RESTATEMENT (SECOND) OF TORTS § 821B(1).

37) that this Court has defined the elements of a federal common law of nuisance

as follows:

> The elements of a claim based on the federal common law of nuisance
> are simply that the defendant is carrying on an activity that is causing
> an injury or significant threat of injury to some cognizable interest of
> the complainant.  *Illinois v. Milwaukee,* 599 F.2d 151, 165 (7th Cir.
> 1979) (overruled on other grounds).

The district court legally erred however, in reading a requirement of

"imminent" harm into the elements of Plaintiffs' public nuisance claims.

> As noted above, the public nuisance tort prevents only "unreasonable"
> interference with a public right, and each of its prongs contemplates
> an active – or, at least, an imminent – threat of injury.  See *Illinois*,
> 599 F.2d at 165; RESTATEMENT (SECOND) OF TORTS § 821B(1).  At
> best, Plaintiffs have shown that Defendants' actions (or inactions)
> conceivably could satisfy one or more of the Restatement tests *if* the
> evidence showed an actual, ongoing injury or imminent threat of
> injury to the water and aquatic resources of Lake Michigan and the
> other Great Lakes.  (S.App. 38 [Emphasis in original].)

Neither authority cited by the district court states that "imminent" harm must be

shown, or supports such a requirement.  In *Illinois*, this Court held either "an injury

*or significant threat of injury*"[13] would suffice.  Similarly, the RESTATEMENT notes

that " . . . for an injunction harm need only be threatened and need not actually

have been sustained at all."[14]

---

[13] *Illinois,* 599 F.2d 151, 165 (emphasis added).

[14] RESTATEMENT (SECOND) OF TORTS § 821B(1) cmt.i.  *See also* § 82F, cmt.b (" . . . either a public or private nuisance may be enjoined because harm is threatened that would be significant if it occurred, and that would make the nuisance actionable under the rule here stated, although no harm has yet resulted.")

26

Under *Illinois* and the RESTATEMENT, Plaintiffs need only show a "significant threat of injury," a lower, and temporally distinct threshold than "imminent" harm.  The district court conflated the imminent irreparable harm prong of the preliminary injunction analysis with the Plaintiffs' likelihood of success on the merits of their underlying public nuisance claim, noting "the same evidence also dooms Plaintiffs' showing of irreparable harm."  (S.App. 39, n. 21.)  This is also legal error.

> **(2)     The evidence showed a substantial likelihood that Plaintiffs will succeed on the merits of their common law public nuisance claim.  The district court's contrary holding is based not only on a legally erroneous standard, but a series of clearly erroneous factual findings.**

The district court concluded that Plaintiff's demonstrated only a "very modest likelihood of success" in their public nuisance claim based upon the following incomplete, and in critical respects inaccurate, characterization of the evidence upon which Plaintiffs rely:

> Even giving every benefit of the doubt to the supportable inferences that can be drawn *from Dr. Lodge's testimony,* the current evidence shows that (1) only one Asian carp has been discovered above the barrier; (2) at most, crediting the eDNA testing, only *a small number* of individual Asian carp exist above the electric barrier; (3) there is *no basis* for concluding that the electric barrier has been breached at all, much less in any significant way; (4) the closest known population of Asian carp in *any significant numbers* is in either the Brandon Road pool (south of Joliet), or more likely, in the Dresden Island Pool (near Morris, many miles below the barrier); (5) the best estimate of the

location of *any juvenile* (or "young of year") Asian carp is even further downstream in the Marseilles area; and (6) the potential for the establishment of a self-sustaining population in the CAWS above the electric barrier or in Lake Michigan remains an *unknown*.  (S.App. 39 [Emphasis added].)

As explained below in Section I.B.2., this characterization of the Plaintiffs' case and the relevant evidence is, in several critical respects, clearly erroneous.

> **(3)  The district court committed further legal error in concluding that the traditional reluctance of a court to enjoin as a public nuisance conduct authorized by law or regulation should be applied here to bar Plaintiffs' nuisance claim.**

The district court further discounted Plaintiffs' likelihood of success on the merits by positing that the relief sought by Plaintiffs here could not or should not be granted on the grounds that it would be inappropriate to enjoin as nuisance "activities which have been considered and specifically authorized by the government"[15] or "conduct that is fully authorized by statute, or ordinance or administrative regulation."[16]  (S.App. 39-43.)  The court further analogized the Plaintiffs' public nuisance claim to the situation presented in *State of North Carolina v. Tennessee Valley Authority*[17] where the Fourth Circuit vacated an injunction requiring the defendant to install additional air emission controls from

---

[15] *New England Legal Found. v. Costle*, 666 F.2d 30, 33 (2d Cir. 1981).

[16] RESTATEMENT (SECOND) OF TORTS § 821B(1) cmt.f.

[17] *State of North Carolina v. Tennessee Valley Authority,* 615 F.3d 29 (4th Cir. 2010).

facilities that operated under permits authorized by federal and state air pollution regulations.

As a legal matter, none of the authorities cited by the district court establish that Plaintiffs are unlikely to succeed on the merits of their public nuisance claim here. To begin with, the activities and conditions that Plaintiffs seek to enjoin as a nuisance – the Defendants' operation of their facilities in the CAWS in a manner that allows an injurious invasive species to enter the Great Lakes – have not been specifically regulated, let alone authorized by law. While it is true that the Corps has general, longstanding authority to operate certain navigational and water control facilities in the CAWS,[18] such authority does not have the effect of exempting the Corps from compliance with other generally applicable law, including the federal common law of public nuisance. Moreover, as the district court correctly held, neither those statutes nor other more recent congressional enactments addressing some aspects of the threatened transfer of aquatic invasive species through the CAWS,[19] have preempted or displaced federal common law. (S.App. 33-36, 43 n. 22.)

---

[18] See, *e.g.*, Act of Dec. 4, 1981, Pub. L. No. 97-88, § 107, 95 Stat. 1135 (CSSC to be operated "in the interest of navigation"); Act of July 30, 1983, Tit. I, Ch. IV, 97 Stat. 301(Chicago Lock); River and Harbors Act of 1946, Pub. L. No. 79-525, 60 Stat. 634 (July 24,1946) (same, for O'Brien lock).

[19] *See,* e.g 16 U.S. C. 4722(i)(3)(dispersal barrier demonstration project"); Water Resources Development Act of 2007 (WRDA), Pub.L. No. 110-114, 121 Stat. 1041, § 3061(d)(feasibility study); Energy and Water Development and Related

Indeed, to the limited extent that Congress has addressed the issue, it has directed the Corps to take actions to *prevent* the movement of aquatic invasive species, including Asian carp, through the CAWS into the Great Lakes.[20] Accordingly, the injunctive relief sought by Plaintiffs in their common law public nuisance claim is consistent with the congressionally stated objectives on this subject. Finally, the fact that the subject of Plaintiffs' claim includes a "complex environmental problem as to which Congress and federal agencies have spoken in some fashion," (S.App. 40) neither places the controversy beyond the competence of the district court nor deprives it of its equitable power under the federal common law. Unless and until further Congressional action clearly displaces common law on this subject, or the Defendants conform their conduct to that law, the district court's exercise of its authority to prevent and abate a common law public nuisance is both proper and necessary.

---

Agencies Appropriations Act of 2010; Pub. L. No. 111-85, 123 Stat. 2845, § 126 (emergency authority).

[20] *See, e.g.,* 16 U.S.C. § 4722(i)(3) (authorizing initial "dispersal barrier" to impede the movement of invasive species through the CAWS); 2007 WRDA § 3061(d) (authorizing a feasibility study of options to "prevent" the transfer of invasive species between the Great Lakes and Mississippi River Basins); §126 of 2010 Energy and Water Development Appropriations Act (authorizing emergency measures "to prevent aquatic nuisance species from dispersing into the Great Lakes.")

### b.    Administrative Procedures Act

As noted above, Count II of Plaintiffs' Complaint is brought against the

Corps under 5 U.S.C. § 702 which provides that "[a] person suffering legal wrong

because of agency action, or adversely affected or aggrieved by agency action

within the meaning of a relevant statute, is entitled to judicial review thereof."

Under 5 U.S.C. § 706(1), a court may "compel agency action unlawfully withheld

or unreasonably delayed . . . "  Pursuant to 5 U.S.C. § 706(2), a court may "[h]old

unlawful and set aside agency actions, findings and conclusions found to be – (a)

Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law . . . " "Agency action" is defined in 5 U.S.C. § 551(13) to include "the whole or

a part of an agency rule, order, license, sanction, relief, or the equivalent or denial

thereof, or failure to act . . . "

Plaintiffs have been adversely affected and aggrieved by a number of actions

taken by the Corps.  (Dkt. #1; Complaint, pp. 30-31; Dkt. # 14-1, Brief in Support

of P.I. Mtn., pp. 44-47; Dkt. # 88; Reply in Support of P.I. Mtn., pp. 48-50.)  Those

actions include:  (i) the decision to operate its facilities in the CAWS in a manner

that allows Asian carp to enter Lake Michigan, (ii) the decision to rely primarily

upon the electrical barrier system as its method to prevent Asian carp from entering

the Great Lakes despite known limitations on its effectiveness, (iii) the decision to

reopen and continue operation of the O'Brien Locks in December 2009 and May

2010, (iv) the denial of requests for additional relief repeatedly requested by Plaintiffs and (v) and the Decision in the Interim III Report to continue routine operation of the Locks.

The district court correctly found that, contrary to the Corps' arguments, the challenged decisions are not mere recommendations, arguably "do . . . carry real and direct consequences to the Great Lakes" and are, therefore subject to review under the APA. (S.App. 26-27.) But the court then mistakenly concluded that Plaintiffs' likelihood of success was only "minimal." (S.App. 27-28.)

> With respect to the first four decisions listed above, the Court found:
>
> [T]he evidence does not support the view that the Corps' actions were wrong at all, much less arbitrary and capricious. In fact, there is no evidence that Asian carp have entered Lake Michigan through the CAWS, that the barrier system has not operated with reasonable effectiveness, or that the operation of the O'Brien Lock has adversely affected Plaintiff's interests. (S.App. 27.)

Again, as explained below in § II.B.2., those factual findings are clearly erroneous.

Plaintiffs also argued that the Corps' decision in the Interim III study, to maintain routine operation of the locks was arbitrary and capricious in several respects. First, while convening an expert Risk Assessment Panel as part of its Interim III Dispersal Barrier Efficiency Study (Dkt. # 47-4, pp. 96-282) to consider possible changes in Lock operations, the Corps arbitrarily constrained the range of options to be assessed, limiting any closure option to no more than two months. The experts were not even allowed to consider and assess the possibility of a

longer period of temporary closure.  Moreover, the Corps decided to continue

routine operation of the locks despite the fact that most of the panel members

concluded that: (a) such a no-change-in-operation scenario presented an

"unacceptable" risk and that "[T]here is an imminent threat that Asian carp (silver

and bighead) will establish a substantial population in Lake Michigan in the near

future".  (Dkt. 47-4, Att. 2 to Dec of Jo-Ellen Darcy, pp. 92, 98); and (b) even if the

lock gates are not completely watertight, closing the locks would "be effective in

significantly impeding the migrations of Asian carp into Lake Michigan."  (Dkt.

47-4, Att. 2 to Dec. of Jo-Ellen Darcy, p. 93.)  Further, three other members of the

panel (Experts 6, 7, and 10) identified permanent physical separation of the

Mississippi and Great Lakes Basins in the CAWS as a recommended additional

means to prevent the establishment of Asian carp in the Great Lakes. (App. 203-

204, question 19.)

The district court characterized Plaintiffs' contentions as "colorable" but then

found:

> [O]n the record compiled before the Court at this time, the Court
> concludes that Plaintiffs are not likely to succeed on a claim that it
> was irrational to exclude from the expert survey the option to
> permanently close the locks – particularly in view of the statutory
> mandate to operate the locks and the concern expressed by witnesses
> at the hearing that taking any such action would require express
> Congressional authorization.  The Corps need not have investigated
> every conceivable option in order to have acted rationally. (S.App.
> 28.)

Viewing the record as a whole, that finding is clearly erroneous. Plaintiffs did not, and do not now argue that the Corps was required to consider every conceivable option. Rather they argued that the possibility of temporary lock closure for a period of more than two months should have been considered particularly in view of the Risk Assessment Panel's findings, noted particularly above. Moreover the Corps, in the Interim III Report itself indicated that it is "prepared to respond to any new information that arises . . . which in the judgment of appropriate experts represents a significant threat that a sustainable population of Asian carp could become established in Lake Michigan . . . [and] USACE is prepared to make recommendations related to lock closure and to consider other appropriate actions . . . " (Interim III, Dkt. # 56-2, p. 52.) The Corps has consistently asserted that it has very broad authority under § 126, and nothing in that statute limits the Corps authority to close locks for only two months at a time.

In sum, the district court's conclusion that Plaintiffs had only a "minimal" or very modest likelihood of success on the merits of their substantive common law nuisance and APA claims is based upon both legal and clear factual errors. Having unjustifiably exaggerated Plaintiffs' burden with respect to likelihood of success on the merits, the district court compounded that error by insisting that the perceived weakness in Plaintiffs' merits case required a heightened showing of imminent, irreparable harm under the "sliding scale." (S.App. 28, 43.)

**2.      Viewed in its entirety, the record shows that Plaintiffs will likely suffer irreparable injury if a self-sustaining Asian carp population is established in the Great Lakes and that establishment of such a population is both likely and imminent if additional interim measures to block the invasion are not taken now.**

The district court's conclusion that Plaintiffs failed to demonstrate a sufficient likelihood of irreparable injury (S.App. 54) is based upon: (a) its mistaken determination that Plaintiffs showed only a modest likelihood of success on the merits (discussed in § 1.B.1 above), (b) its unduly narrow focus on only limited parts of the evidence supporting Plaintiffs' motion for preliminary injunction, and (c) a series of clearly erroneous findings of fact.  As explained below, those erroneous findings include, but are not limited to the following assertions by the court:

(a)      There is "no evidence" that the Corps' electrical barrier system is not effective, has been breached, has failed to effectively deter Asian carp, or that Asian carp have entered Lake Michigan through the CAWS and the O'Brien Lock.  (S.App. 27, 39, 50.)

(ii)      The state of eDNA science does not permit a reasonable inference that live Asian carp are in the canal system above the barriers in numbers that present an imminent threat.  (S.App. 48, 51.)

(iii)      The credible testimony of three witnesses with extensive expertise in Asian carp biology and in assessing populations of Asian carp indicates they are there only in low numbers – numbers that are effectively being assessed and managed by the aggressive inter-agency efforts and that do not present an imminent threat to establish a successful breeding population.  See Wooley Testimony 474: 25 – 475: 20, Chapman Testimony 412: 17-24 (S.App. 49.)

35

(iv)    It is far from certain that Asian carp can survive and reproduce in the Great Lakes.  (S.App. 77.)

At the outset, the district court grossly over-simplified the evidence supporting Plaintiffs' case and then wrongly assumed that that portion of the evidence, standing alone, must establish the likelihood of imminent and irreparable harm:

> Plaintiffs' claim of imminent irreparable harm relies heavily on the conclusions that they draw from positive eDNA results above the electric barrier coupled with the discovery of a single live fish in Lake Calumet and one dead fish found south of the barrier (near Lockport) in the December 2009 rotenone event.  See generally Testimony of Dr. David Lodge.  *This evidence* must demonstrate that Plaintiffs have carried their burden "that irreparable injury is likely" – not just possible – "in the absence of an injunction."  (S.App. 44 [Emphasis added, citation omitted].)

While Dr. Lodge's testimony regarding the positive eDNA results and the recovery of the dead Asian carp near Lockport in December 2009, and of the live Asian carp captured in Lake Calumet in 2010, are important elements of Plaintiffs' case, that is far from the totality of it.  On the contrary, as outlined below, the record contains multiple lines of evidence from numerous sources demonstrating that Plaintiffs will likely suffer irreparable harm absent the requested preliminary injunction.

       **a.**    **The characteristics of Asian carp and their history in the U. S. waterways support their likely establishment in the Great Lakes if their migration through the CAWS is not stopped immediately.**

As the district court observed, Asian carp are highly invasive and injurious:

36

> Since their escape from ponds in the lower Mississippi River basin,
> both silver and bighead carp populations have become established in
> rivers in the Mississippi River Basin, including the Illinois River.
> Asian carp have substantially disrupted and in some areas largely
> displaced native fish populations in these rivers, impairing
> recreational and commercial fishing.  Also, because of their large size
> and jumping ability, silver carp have injured boaters and caused
> property damage.  (S.App. 6.)

Even the Corps has acknowledged that "[t]he prevention of an inter-basin transfer

of bighead and silver carp from the Illinois River to Lake Michigan is paramount

in avoiding ecological and economic disaster.  (S.App. 6, n.6.)

> **b.    Well-established biological principles show that Asian
> carp are likely to become established well before the
> resulting damage is apparent, and the threshold of an
> invasion is a critical juncture at which preventative
> action is urgently needed.**

As individual fish disperse from established, reproducing populations into

new environments, they are part of the "invasion front" or leading edge of the

invasion.  (App. 73.)  By definition, few individuals of the target species exist at

the leading edge of the invasion.  (App. 144.)  And, as discussed in greater detail

below, traditional tools for detecting fish such as netting and electrofishing, even

when employed with considerable effort, are likely to detect only a small fraction

of Asian carp present at the invasion front.  (App. 72-73, 98-100.)

Beyond the absolute minimum requirement of one male and one female, it is

uncertain what, if any minimum number of Asian carp is needed to establish a self-

sustaining population (App. 92.)  However, it is generally understood and agreed

among biologists that there is a positive relationship between the number of individuals entering the new environment and the probability of a population establishing; therefore, the key to preventing an invasion is minimizing the number of individuals gaining access to the ecosystem of concern.  (App. 92, 168-169.)

Biologists also recognize that an invasive species often becomes established in a new environment long before resulting adverse effects, and the invasion itself is recognized.  Dr. Lodge explained that a combination of factors – an initial lag in the growth of an established population, and limitations on human's ability to detect invasions – "often mean that the recognition that an invasion has happened and that the impacts are occurring often happen long after the population has established."  (App. 96-97.)  Indeed, Mr. Chapman specifically acknowledged the likelihood of such a lag between the establishment of Asian carp in the Great Lakes ecosystem and the ability to detect it:

> When at low densities, adult Asian carps are amazingly difficult to capture with any standard fisheries techniques.  Because of these characteristics, small populations can exist without detection.  Small numbers of fish could expand over very large distances in the Great Lakes, before conditions that precipitate in large population increase are encountered by the fish.  However, it is important to remember in the coming years that failure of Asian carps to cause undesirable effects in the Great Lakes over the short term does not mean that undesirable effects have been avoided.  (App. 174-175; see also App. 358, 370-371.)

Once establishment occurs, an invasion is likely irreversible.  (App. 90, 119, 125.)  Mr. Chapman acknowledged that there certainly has not been a good track

38

record of controlling invasive species once established in the Great Lakes.  (App. 366.)  While he speculated about the possibility that in the future, some other techniques might be developed to successfully control Asian carp populations in the Great Lakes (App. 365-366), Mr. Chapman conceded that he was not aware of anything that would definitely work.  (App. 366-367.)

Finally, as Dr. Lodge observed, from a biological and economic perspective, preventing the spread of invasive species or preventing the invasion in the first place is a far more cost-effective strategy than allowing the invasion to occur and then trying to control it.  (App. 89-90.)  Dr. Newcomb similarly emphasized the need to use every available tool to minimize the number of Asian carp that can reach Lake Michigan, reducing the risk of establishing a reproductively viable population there (App. 126), and that from a fisheries management sense, trying to control Asian carp already established in Lake Michigan makes no sense when the opportunity still exists to prevent the invasion from occurring.  (App. 137.)  Mr. Chapman likewise agreed, that from a fisheries perspective, it makes the most sense to act to prevent an invading species from entering the Great Lakes so they can't create a reproducing population.  (App. 108.)

c.     **Even extensive netting and electrofishing detect only a small fraction – as little as one percent – of Asian carp present in the CAWS.**

The Corps and other members of the Asian Carp Regional Coordinating Committee have relied almost exclusively upon traditional fisheries sampling techniques – netting and electrofishing – to determine the presence of Asian carp in the CAWS and to control Asian carp that are above the electric barrier system.  As noted above, the Committee has only twice applied the fish poison rotenone in the CAWS:  on one day in December 2009 in a 5.7 mile segment near the electrical barrier system and one day in May 2010 in a 2.5 mile segment south of the O'Brien Lock and Dam.  These poisonings briefly treated only a small portion of the more than 70 mile long CAWS.

The scientific evidence in the record shows that while netting and electrofishing are well-established techniques for collecting fish where they are already abundant, they are not effective in collecting fish along an invasion front where they are, by definition rare, (App. 144) and these traditional tools, "even with extraordinary efforts, catch only a small proportion of even fish that are easy to catch."  (App. 72.)  Moreover, according to both Mr. Chapman and Dr. Lodge, Asian carp are exceptionally difficult to collect with these methods, even where their location is already known, because of their avoidance of nets and boats. (App. 174-175, 105-106; Dkt. # 47-4, Att. 2 to Dec. of Jo-Ellen Darcy pp. 261-

262; App. 73.)  Indeed Mr. Chapman has inferred from his own exhaustive experience in attempting to capture Asian carp with nets and electrofishing that "if you catch one fish without previously knowing where it was, there may easily be hundreds of fish down there" (Dkt. # 56-2, p. 289).  As a member of the Risk Assessment panel, he described fishing for Asian carp in the CAWS as "searching for a needle in a haystack" (App. 209) and opined that "if there are a hundred carp in the CAWS you would have difficulty catching one with standard commercial fishing techniques and electrofishing . . . [i]f there are more, then perhaps you might start to catch fish."  (App. 202.)

The district court stated that it "accepts Plaintiffs' contention that the traditional sampling efforts only result in a small percentage of actual fish being present and that these particular fish are hard to capture."  (S.App. 51.)  But the court then found that only a small and insignificant number of Asian carp individuals exist in the CAWS above the electric barrier because the netting and electrofishing was "extensive" and:

> As Mr. Wooley and Dr. Lodge explained, the value of electrofishing and netting depends on the level of effort and combination with other tools. Wooley 489:9-14 (the shortcomings of the traditional methods can be overcome by frequency, repetition and utilizing various tools and certain combinations); (acknowledging that in the case of rare species, increasing the sampling effort makes the traditional methods effective).  (S.App. 50-51.)

Viewing the record as a whole, that finding is clearly erroneous. First, as to the discussion of Dr. Lodge, the Court was apparently misled by the Corps' highly selective and misleading citation and characterization of his testimony. What Dr. Lodge actually said, in a report submitted to the Corps was: "In the case of rare species, the only solution is to change the detection methods to increase detection probability and/or increase sampling effort." (App. 93.) But he did not testify that increasing the intensity of electrofishing and netting would make them effective in detecting Asian carp in the CAWS. On the contrary, he stated those methods are "not appropriate for the goal of trying to identify an invasion front where by definition [the] species will be rare." (App. 94.)

More important, as Dr. Lodge testified, a scientific paper recently published by Dr. Greg Sass and colleagues documented that using conventional tools, even with extraordinary effort, in a waterbody where Asian carp are known to be abundant, they were only able to capture less than one percent of the carp estimated to be in the pool (App. 72-73, 98.) So, from a scientific perspective, even while the Committee's recent electrofishing and netting operations were extraordinary in comparison to what management agencies typically do, it is "unlikely" that those efforts are "sufficient to catch even a small fraction of the population" in the areas being fished. (App. 99.)

42

The only record support for the supposed efficiency of "extensive" netting and electrofishing is Mr. Wooley's assertion that their combined use and "repetition" somehow makes them effective in determining the number of Asian carp in the CAWS. (S.App. 8, 50; Tr. 489.)  To begin with, contrary to the court's wholly unsupported finding, Mr. Wooley has no personal expertise, "extensive" or otherwise, "in Asian carp biology and in assessing populations of Asian carp." (S.App. 49.)  Mr. Wooley supervises other USFWS biologists in the region and represents the service in inter-agency consultations.  (App. 374-375, 380.) Although he has training and experience as a biologist and has during his career used the conventional fish detection methods in other settings (App. 374-375, 380), he neither claimed nor documented any personal expertise in Asian carp biology or the detection of Asian carp.  The fact that the same fishing gear and techniques had succeeded in capturing some Asian carp in the Illinois River where they are already known to be abundant was not designed to establish the efficiency of those methods in determining the number of fish present (App. 116-117).  Nor, as a logical or scientific matter, does it show that those methods and equipment are effective in assessing Asian carp populations along the invasion front.  Moreover, Mr. Wooley acknowledged there were no peer reviewed scientific studies establishing the effectiveness of those methods in detecting Asian carp in an environment where they are not abundant.  (App. 111.)

43

Notably, the Defendants' only witness with actual expertise in Asian carp biology and population assessment, Mr. Chapman, did not testify that even the combination of electrofishing and netting, with repetition, would accurately determine the Asian carp population in the CAWS.  As a member of the Risk Assessment Panel he emphatically stated, "**You might be able to do something to increase your chances, but in any case capture of one fish probably means there are many uncaptured fish.**"  (App. 195 [emphasis in original].)  And, after the capture of one bighead carp in Lake Calumet, and the intensification of netting and electrofishing, Mr. Chapman concluded:  "It is likely that we did not capture all the bighead and silver carp from the CAWS or Lake Michigan."  (App. 161-162, ¶ 26.)

In sum, the credible scientific evidence before the district court made it clear that the conventional fisheries sampling techniques (extensive netting and electrofishing and limited rotenone application) could not and did not determine the number of or control Asian carp in the CAWS.  Under the circumstances, the recovery of two carp bodies in the CAWS indicates that "there are probably one or more orders of magnitude more fish there than have been caught."  (App. 102-103.)  Thus, the fish recovery evidence supports the conclusion that not just two, but as many as two hundred Asian carp likely are, or have been present in the CAWS.

44

**d.     The scientific evidence, including, but not limited to the unrebutted testimony of Dr. Lodge shows that a positive eDNA detection likely represents the recent presence of at least one Asian carp.**

In both his Supreme Court declaration (App. 145-150) and his hearing testimony, Dr. Lodge carefully explained the scientific underpinnings of the methods that he and his colleagues used in applying environmental DNA techniques to the detection of Asian carp in Illinois waterways, including the CAWS.  The methods used are well established among molecular biologists, and represent only an incremental extension and improvement of established scientific methods of indirectly detecting organisms using DNA those organisms release into the environment.  (App. 74-76.)  He also explained how the methods and techniques had been independently reviewed and validated by an audit team of independent scientists convened by the Environmental Protection Agency.  (App. 74-77, 148-149.)

Dr. Lodge explained why he and his colleagues had concluded that a positive eDNA test sample meant that a live Asian carp had released DNA material in the vicinity of the sampled water within the prior 24 hours.  (App. 77, 79-80, 161.)  He also testified how he and his colleagues had carefully considered a variety of other alternative hypotheses for the origin of a positive DNA test including ballast water, sewage, excrement from birds that had eaten carp, and carcasses of dead carp, and concluded that the most scientifically plausible

45

explanation was the recent presence of a live carp.  (App. 81-84, 159-161.)
Considering the pattern of the positive detections in time and space, and the
relationship to other evidence of Asian carp presence, he concluded that the data
showed the existence of multiple live carp in the CAWS above the barrier.  (App.
102-103, 158.)  His testimony was unrebutted by any other expert.

It is undisputed that between December 2009 and May 2010, 60 separate
samples of water in the CAWS above the electrical barrier tested positive for
bighead or silver carp eDNA.  These included positive sample for silver carp in
Calumet Harbor (Dkt. # 47-8 ¶ 57; S.App. 21; App. 66, 87) and at the mouth of the
Chicago River (App. 66) each of the latter in, or on the edge of Lake Michigan.
Dr. Lodge has acknowledged that as currently applied, the method does not
determine how many individual Asian carp are responsible for a positive result.
His unrebutted conclusion is that a positive result is most likely associated with at
least one live fish, but could just as well indicate the presence of tens or hundreds
or more individual silver or bighead carp."  (App. 143-144 ¶ 37.)  While the
possibility that a single fish could contribute to multiple positive test results cannot
be excluded (App. 157) the fact that many positive results are separated by great
distances increases the confidence that multiple Asian carp are present.  (App.

102.)[21]  Thus, even assuming half of the positive samples reported between

December 2009 and May 2010 were from distinct fish, that would mean there have

already been at least 30 Asian carp in the CAWS above the barrier.  Furthermore,

given that the CAWS is a huge waterway, that the sampling coverage throughout

the waterway is not complete (App. 86) and that even where eDNA samples are

collected they sample relatively small portions of the water at any given time, the

results of the eDNA sampling would likely understate, rather than overstate the

number of Asian carp present.

> **e.    Contrary to the district court's findings, the "small" number of Asian carp in the CAWS – even if less than 100 – presents an imminent risk of Asian carp invasion and establishment in the Great Lakes.**

As noted above, the district court made a series of findings that the "small"

number of Asian carp in the CAWS are not "significant" (S.App. 39, 51.)

Although the court did not explain how it determined the threshold of

"significance", it apparently assumed that only populations of thousands or more

Asian carp such as existed in the Brandon Road or Dresden Island pools or

juvenile Asian carp like those found in the Marseilles area must be present in the

---

[21] It is also important to note that for reporting purposes, multiple, closely spaced positive results were reported as a single positive.  For example, five separate positive samples depicted in (App. 67) were reported as only two positives.  Similarly, seven positive tests depicted in (App. 68) were reported as only two. (App. 66.)

CAWS to establish an imminent risk of establishment in Lake Michigan or beyond. (S.App. 39.)  That apparent assumption is further reflected in the court's emphasis on the fact that:  (a) members of the Risk Assessment Panel, including Dr. Sass, opined that there was not yet evidence that a self-sustaining (reproducing) population existed above the electric barrier, and (b) that larval fish tows[22] had not collected any larval Asian carp in the CAWS.  (S.App. 50.)

The underlying fallacy of these assumptions is the presupposition that Asian carp reproduction must first occur in the CAWS itself before Asian carp could navigate to Lake Michigan and establish populations there.  No testimony in this record supports those assumptions.  On the contrary, both Mr. Chapman and Dr. Newcomb testified that Asian carp are highly mobile and can swim long distances to find desirable habitat and spawning opportunities.

Moreover, there are several lines of evidence in the record indicating that, notwithstanding the absence of documented reproduction in the CAWS, relatively small numbers of adult Asian carp – indeed less than 100 individuals entering Lake Michigan – would be sufficient to trigger a sustainable population in the Great Lakes.  Although some members of the risk assessment panel expressed uncertainty on the subject, one expert stated "several dozen adults" and another stated "5-50," when asked how many Asian carp it would take to establish a

---

[22] Such larval fish tows had commenced only two weeks before the hearing.  (Tr. 506, 508.)

reproducing population in Lake Michigan.  (App. 185.)  The latter expert (Expert 7) elsewhere explained:

> . . . because an unknown number of fish have very likely already gotten in to Lake Michigan, the addition of another 10 – 20 fish (which could be present but missed by sampling efforts), could be just the additional number of fish to cause a population to become established in Lake Michigan.  (App. 188.)

Other members of the panel referred to a model developed by Michael Hoff, who did not identify a threshold, but commented "it is possible . . . for a minimum level of adult abundance to establish a population that is self sustaining at low levels for a period of years."  (App. 185.)

Expert 10, Dr. Sass (App. 381), noted it was possible, but unlikely that only one male and female fish and the right spawning conditions could establish a population.  He stated that "we shouldn't be worried about how many . . . the more fish we allow to enter the Great Lakes, the higher the probability of establishment." (App. 185.)  Dr. Sass elsewhere emphasized that the threat to Lake Michigan is great whether an individual Asian carp is captured in the CAWS or not, that most likely, Asian carps are already in Lake Michigan (App. 188), the locks should be closed indefinitely right now (App. 189) and we need to be working on ways to permanently disconnect the Great Lakes and Mississippi basins.  (App. 188, 200.)

Mr. Chapman did testify that in his opinion the number of Asian carp above the barrier is "probably very low" (App. 368) and it was a "good guess" that the

49

number of fish probably won't create a sustainable population in the Great Lakes. (App. 369.)  But Mr. Chapman did *not* testify as the court found, that the number of Asian carp "are effectively being assessed and managed by the aggressive interagency effort.   (S.App. 49.)[23]  Mr. Chapman, like a majority of the risk assessment panel, answered "yes" to the question of whether there is an "imminent threat that Asian carp, silver and bighead, will establish a sustainable population in Lake Michigan in the *near future*."  (App. 359, emphasis added.)  In his follow up comments on the survey form he explained "I answered this question as to when I believed a population of fish could begin *living and breeding in the Great Lakes*, NOT meaning that they would be abundant or problematic in the times specified ". (App. 210, emphasis added.)  Moreover, with respect to "numbers of individuals required for successful invasions," Mr. Chapman's Declaration noted, with some qualification, that "[o]ne successful invasion of an Asian carp to a reservoir is thought to have been the result of an escape of only about 50 fish . . . "  (App. 159.)

Finally, both Dr. Newcomb and Dr. Lodge testified that there is an imminent and increasing risk that Asian carp will invade the Great Lakes.  Dr. Newcomb stated:  " . . . silver carp and bighead carp pose a significant risk to the ecosystem of the Great Lakes should even a relatively small number of this fish enter the Great Lakes system and begin reproducing," (App. 105) and that " . . . even if there

---

[23] For that and the other reasons noted herein, that finding is clearly erroneous.

are only a few individuals now present above the electrical barrier, every passing

day, month and year that Asian carp are not prevented from entering the Great

Lakes, the probability increases that a reproducing population will become

established in the Great Lakes as these fish are long-lived and, as adults subject to

little natural mortality as specifically noted by Mr. Chapman." (App. 124-125.)

Based upon his extensive expertise in the biology of invasive species, the

available information concerning observation and capture of Asian carp in the

Illinois Waterway and the pattern and distribution of eDNA data, Dr. Lodge

concluded:

> I think there is a risk, a very urgent and imminent risk of invasion
> given the demonstrated presence of bighead Carp with unimpeded
> access to Lake Michigan and the indication from eDNA that the same
> situation applies to silver carp." (App. 79.)

And, since "the more individuals that enter the lake, the more likely it is that a

population will become established . . . " (App. 82) "There remains an urgent need

to reduce the probability that both silver or bighead carp individuals can enter Lake

Michigan." (App. 149.)

### f.   Contrary to the district court's findings, there is evidence in the record that the electrical barrier system has failed to prevent Asian carp from entering the CAWS and Lake Michigan.

The district court clearly erred in finding that there is "no evidence that

Asian carp have entered Lake Michigan through the CAWS and the O'Brien Lock

51

(S.App. 27) and that the electric barrier has failed to prevent Asian carp from migrating into the CAWS." (S.App. 27.) Contrary to the court's suggestion, the Plaintiffs' contentions regarding the inadequacy of the electric barrier does not depend simply upon "the presence of a single live fish (or a small number of individual live fish) above the barrier." (S.App. 50.)

Rather, as Plaintiffs argued in the district court, multiple lines of evidence, viewed in their entirety, demonstrate that even if, as Plaintiffs sincerely hope, the barrier does have a beneficial effect in deterring the passage of Asian carp, it has not prevented some Asian carp from entering the CAWS, and cannot be relied upon to preclude the passage of additional Asian carp now or in the foreseeable future. First, it is undisputed that Asian carp have been expanding northward through Illinois waterways toward the CAWS for several years. Second, as Dr. Lodge testified, statistical analysis of Asian carp observations in those waterways indicates that bighead and silver carp had arrived at and have been "challenging" the barrier system since 2007-2008, earlier than had previously been assumed by the Corps. (App. 65; Tr. 25-29.) Third, the temporal and spatial patterns of positive eDNA detections both below and above the barriers strongly suggest that at least some bighead and silver carp were able to swim into the CAWS, notwithstanding the barrier. While acknowledging that alternative explanations were possible, Dr. Lodge testified that "The presence of living silver and bighead

carps north of the electric barriers is most plausibly explained by failures of the

electric barrier to completely restrictt the northward movement of silver and

bighead carps."  (App. 161.)

Although no one can be certain about the origin of the two bighead carp

captured in Lake Calumet, Dr. Newcomb testified that:

> [T]he most scientifically plausible inference is that the fish in question
> is one of a number of bighead and silver carp that have migrated
> through the CAWS, swimming either through or around the electrical
> barrier, based upon:
>     (a)  The well documented migration of numerous bighead and
> silver carp though Mississippi, Illinois and Des Plaines Rivers to the
> vicinity of the Lockport Dam;
>     (b)  The recovery of a dead Asian carp in the Canal above the
> Lockport Dam in December, 2009; and
>     (c)  The timing and spatial distribution of positive eDNA test
> results for bighead and silver carp in 2009 and 2010 at multiple
> locations in the CAWS above or lakeward from the electrical barrier
> that preceded the recent capture of the bighead carp in Lake Calumet.
> (App. 129-130.)

Attempts to determine the origin of that fish through analysis of its tissue were

inconclusive.  (App. 138.)  The fact that bighead carp DNA had been repeatedly

detected south of the O'Brien Lock and Dam and, thus Lake Calumet (App. 67)

supports the inference that the fish captured in Lake Calumet swam through the

O'Brien Lock.

As noted above, silver carp eDNA has been detected in Calumet Harbor, North of the O'Brien Lock and on the edge of Lake Michigan.  (App. 67.)[24]  Mr. Chapman noted that because of differences in the culture, marketing and uses of silver carp in comparison to bighead carp, it is unlikely that the silver carp whose eDNA was detected there came from a fish market, "cultural" release or escape from a pond.  (App. 164.)

The record contains a variety of other evidence that the electrical barrier system cannot be relied upon to preclude additional Asian carp from entering the CAWS.

This includes but is not limited to the fact that:

- It is experimental.  The Corps' Interim I Report of January, 2010 states: "The electric barrier system is considered experimental and temporary fix to this problem . . ."  (App. 197.)

- Even though it uses off the shelf field generators, they had never been used in an application as large and complex as the CAWS; the previous applications were intended only to "deter or to stop fish from swimming into pipes, either outfall pipes or inlet pipes, as well as to stop fish from swimming through small channels between various water bodies."  (App. 353-354.)

---

[24] That fact, the similar detection of silver carp DNA at the mouth of the Chicago River (App. 68), Dr. Lodge's testimony (App. 87), Mr. Chapman's observation that some Asian carp have likely already entered Lake Michigan (App. 175-176, 368-369) and similar observations by other members of the Risk Assessment Panel (App. 128, question 11, Experts 7 and 10) show the Court's finding of "no" evidence that Asian carp had entered Lake Michigan (S.App. 27) is clear error.

- No previous application of the electric barrier technology had ever come close in magnitude or importance to its purpose in the CAWS. (App. 354-355.)

- There have been no prior applications or studies of this technology specifically for deterring Asian carp. (App. 355.)

- It is unable to operate "for several weeks and perhaps a few months" of the year at optimal parameters due to high water temperatures and/or high salinity. (App. 349.)

- It is unable at its current operating parameters to deter juvenile Asian carp. (App. 350-352.)

In sum, the district court's findings with respect to the past and continuing ability of the electrical barrier system to prevent the passage of Asian carp are clearly erroneous. The likelihood that at least some additional Asian carp will penetrate the electrical barrier system, following those already above the barrier, further demonstrates the imminent threat that, absent the requested preliminary injunction, Asian carp will become established in the Great Lakes.

> **g.    Contrary to the district court's findings, the scientific evidence in the record shows that the Great Lakes ecosystem will support the establishment of self-sustaining populations of Asian carp.**

The district court clearly and materially erred in finding that "the potential for the establishment of a self sustaining population . . . in Lake Michigan remains unknown" (S.App. 39) and "it is far from certain that Asian carp can survive and reproduce in the Great Lakes." (S.App. 53.) Those findings arise, once again,

from a selective and, in some instances, inaccurate characterization of the evidence.

First, the court was apparently misled by the Defendants into confusing some scientific uncertainty about *where* in the Great Lakes Asian carp would most likely establish with *whether* such establishment could occur at all.  When counsel for the Corps suggested to Dr. Lodge that scientists disagree about the potential for the establishment of Asian carp in the Great Lakes, he responded:

> I don't know whether disagreement would be appropriate.  I think everyone to whom I talk and every statement I read acknowledges a great deal of *uncertainty* about *what parts of the Great Lakes* might be *at most risk* from an invasion by either silver or bighead carp."  (App. 95 [emphasis added].)

There is considerable evidence in the record, from a variety of sources, that the Great Lakes ecosystem includes opportunities for Asian carp reproduction and suitable habitat.  Some of this evidence is summarized by Dr. Newcomb.  (App. 121-123.)

This evidence confirms that nearshore areas and waters connected to the Great Lakes are likely habitat for Asian carp:

- There are 22 rivers in the Great Lakes region that are of suitable length for Asian carp reproduction, plus more in Canada.  (App. 361-362.)

- "[T]here is a significant concern that Asian carp will thrive in the nearshore waters, drowned rivermouths and bays, connecting waters, large rivers tributary to the Great Lakes, and many of the over 10,000 lakes that are present in the state."  (App. 134-135.)

- The St. Joseph River in southwest Michigan is a likely place for Asian to spawn. "It's one of the first places we'd look at." "We have no reason at this point to believe" that this river wouldn't support "Asian carp reproduction and recruitment, recruitment being survival of the young up to an adult." (App. 362.)

- Asian carp "may become established in embayments, estuaries, lagoons, and river mouths" and these "types of water bodies are found within Lake Michigan and through out the entire Great Lakes basin." Asian carp "would also likely invade the Lakes' tributary streams and rivers where they would most likely spawn." (App. 193-195.)

As for the rest of the Great Lakes, the weight of the evidence supports the

likelihood that Asian carp can survive, and possibly thrive, in at least some of their

open waters:

- A "sophisticated," "complex," peer reviewed study by a Mr. Chin predicted that the likely range for silver carp in North America "extends well into southern Canada and includes all of the Great Lakes." (App. 360-361.)

- A model prepared by Dr. Sandra Cooke suggesting that Asian carp would find insufficient plankton in the open waters of Lake Michigan fails to consider alternative food sources and is therefore suspect. Concerning Lake Balaton, Hungary "[a]ccording to the Cooke model, the fish should have a tough time there [because, according to the Cooke theory, there would be insufficient food sources in that lake]. What we find, in fact, is that the fish in that particular body of water are quite robust. They're large and very, very fat." (App. 364.)

- Dr. Newcomb concurred: "While the argument has been presented by some researchers that Lake Michigan is a "plankton desert" and therefore not suitable for habitat by Asian carp, I believe that the existing planktivorous fish community provide evidence to the contrary." (App. 134.)

- Mr. Wooley, citing a USFWS review, made similar observations, noting Asian carp: "prefer a wide temperature range, indicating their ability to thrive from the northernmost waters of the Great Lakes to the waters of the

middle Mississippi River Basin," "prefer large river and lake habitats . . . which are abundant in the Great Lakes . . .ecosystems," and "seem well suited to life in the Great Lakes."  (App. 193-194.)

Second, the court conflated the issue of the imminence and likelihood of *establishment* of reproducing Asian carp populations in the Great Lakes with the timing of a large scale *expansion* of such a population to levels where environmental and economic harm would become apparent, citing testimony by Mr. Chapman.  (S.App. 53.)  As noted above, Mr. Chapman has acknowledged the potential for Asian carp to become established long before their problematic effects become evident, and that from a scientific, fisheries perspective, it would make more sense to prevent these species from establishing in the Great Lakes in the first place.  (App. 108.)  This is consistent with the views of other scientists, such as Drs. Lodge (App. 90) and Newcomb (App. 119, 125) who have emphasized the difficulty, if not impossibility of reversing an invasion once established.

> **h.    The Corps has admitted, and the evidence shows that if Asian carp become established in the Great Lakes, Plaintiffs and other users of the Great Lakes will likely suffer irreparable harm.**

In the prior, related litigation in the Supreme Court seeking a similar preliminary injunction against the Corps, the United States, relying upon declarations by General Peabody and Mr. Wooley, admitted that:

58

[A]llowing a reproducing population of Asian carp to establish itself in Lake Michigan *likely would be an irreparable injury*, . . .[25]

\* \* \*

As discussed above, we agree that the forecasted harm to the Great Lakes from the establishment of a population of Asian carp -- if it were to occur -- would be both *grave and irreparable*.[26]

These admissions are binding upon the Corps.  Federal courts of appeal may consider the statements in a party's brief as admissions of facts.[27]  The general rule is that a party is bound by admissions made in its pleadings.[28]  In the Seventh Circuit, an admission made by a party in one proceeding is admissible in a different proceeding, though the party who made the admission must be permitted to respond to it.[29]

Moreover, as noted above, and as Drs. Lodge and Newcomb, and even Mr. Chapman testified, once invasions occur they are usually irreversible.  And, as Dr. Newcomb further explained, establishment of Asian carp in the Great Lakes will

---

[25] U.S. Memo in Opposition to Motion for Preliminary Injunction, p. 43, dated January 2010, filed in Supreme Court http://www.supremecourt.gov/specmastrpt/US_Memorandum_in_Opposition.pdf (emphasis added).

[26] *Id*. p. 47 (emphasis added).

[27] *Young & Vann Supply Co. v. Gulf, F. & A. Ry. Co.*, 5 F.2d 421, 423 (5th Cir. 1925).

[28] *Soo Line R.R. v. St. Louis S.W. Ry.*, 125 F.3d 481, 483 (7th Cir. 1997) (*citing Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995); *see also Schott Motorcycle Supply, Inc. v. American Honda Motor Co.*, 976 F.2d 58, 61-62 (1st Cir. 1992); *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985); *Freedom Nat'l Bank v. Northern Ill. Corp.*, 202 F.2d 601, 605 (7th Cir. 1953).

[29] *Enquip, Inc. v. Smith-McDonald Corp.*, 655 F.2d 115, 118 (7th Cir. 1981).

cause considerable and probably irreversible ecologic and economic harm.  (App.

90, 107, 123-125.)

Furthermore, in his testimony at the hearing, Mr. Chapman clarified

statements in his declaration regarding potential harm to the Great Lakes:

- He affirmed even if the fishery wasn't completely destroyed, there could "still be major economic and environmental damage" from an invasion. (App. 373.)  In comparison to the damage already done in the Mississippi and Illinois Rivers he added "The value of the Great Lakes fishery is a lot higher, so you have a lot more to – they have a lot more to lose in that case in terms of economics."  (App. 373.)

- When asked if he believed that there was no need to take measures to control Asian carp now because they might be controlled after they get into the Great Lakes, he said, "No, I'm not suggesting that.  I'm not suggesting anything of the kind."  (App. 365.)

In sum, Plaintiffs showed not only a substantial likelihood of success on the

merits, but that in the absence of the additional interim measures to block the

migration of Asian carp into Lake Michigan, they are likely to suffer irreparable

harm.

> **3.    Even if the interim control measures requested by Plaintiffs will cause some temporary localized economic harm, the facts confirm that the balance of harms tips decidedly in favor of Plaintiffs who will incur long term irreparable harm to the environment and to their economies spread throughout the entire Great Lakes region if a self-sustaining population of Asian carp becomes established in the Great Lakes.**

### a.    The record evidence easily satisfies the reduced showing of relative harms applicable here.

A proper balancing of the harms must begin from the premise, as explained in § I.B.2, that Plaintiffs have made a strong showing of both irreparable injury and likelihood of success on the merits.  As noted by this Court in *Girl Scouts of Manitou Council*, "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor. . ."[30]  The evidence of the relative harms presented at the hearing more than satisfied the modest showing required here to support entry of a preliminary injunction.

While the lower court conducted a balance of harms analysis, by its own admission, it did so only "briefly" because it believed that anything more than a "cursory" analysis was unnecessary following its conclusions regarding the threshold factors of likelihood of success and irreparable injury. (S.App. 55 n. 16.) As shown above, the lower court erred when it assessed these threshold factors. Given that the trial court incorrectly assumed that Plaintiffs had not shown a significant irreparable injury and had no more than a "modest" likelihood of success on the merits, it could not properly balance the remaining factors.  Thus, its conclusion after this cursory analysis that the balance of harms favored Defendants can be given little or no weight by this Court.  The lower court's error is crystallized in its concluding statement that the harms asserted by the Defendants

---

[30] *Girl Scouts of Manitou Council,* 549 F.3d at 1086.

61

"outweigh the more remote harm" identified by Plaintiffs, i.e., that the Asian carp will establish a sustainable population in Lake Michigan that will lead to economic and environmental disaster that is irreversible. (S.App. 61.) As shown above, the establishment of such a population is far from "remote." While the lower court made other erroneous findings and conclusions, these findings by themselves establish that the court's balancing of harms analysis should not be accepted.

> **b.    Any concerns arising from potential flooding are moot; Plaintiffs' proposed injunction would allow opening of the locks and sluice gates — consistent with current practices — when necessary to avoid flooding.**

Defendants have argued throughout this litigation that the relief requested by Plaintiffs will lead to flooding and various economic and ecological harms due to obstruction of the free flow of water through the CAWS. As set forth below, Defendants' concerns of flooding and associated economic harms are moot because the relief requested by Plaintiffs will allow the District and the Corps to manage flood waters as they currently do.[31] (October 18, 2010 Tr. 93-94.) The installation of removable sluice gate screens equipped with automatic raking machines, along

---

[31] Defendants' concerns about odors and ecological harm due to stagnant water are also moot because the relief requested would allow the sluice gates to remain open, provided that screens are installed, so "discretionary diversion" water can continue to flow into the CAWS. (Dkt. # 88, Reply Brief, pp. 21-23; October 19, 2010 Tr. 46.)

with block nets in the Little Calumet River, would allow free passage of water
through the CAWS while minimizing the risk of adult Asian carp passage.

The lower court assumed that the mere installation of the screens on the 12
sluice gates would cause serious harm (S.App. 58) even though there was no
evidence of this at the hearing.  In fact, the Corps' engineer, Dr. Su, testified that
the installation of screens in all 12 sluice gates would likely raise the water level in
the CSSC by only three tenths of a foot.  (App. 390-391.)  Furthermore, while Dr.
Su testified that his modeling suggested that if the screens became clogged with
debris it would cause flooding, he acknowledged that he did not consider the
installation of automatic raking machines when he prepared the models.  (App.
389-391.)  The testimony of Mr. Cox established that the Corps does in fact use an
automatic raking machine at one of its locks in the Joliet area.  (App. 386.)  The
only complaint about this machine seemed to be that it had to be manually cleaned
annually and broke down more than expected.  (App. 386.)  There was no
testimony that it didn't "rake" away debris from the sluice gate as it was intended to
do.  Mr. Cox also admitted that this raking machine was an older technology.
(App. 386.)  Thus, the evidence supports the conclusion that such raking machines
would significantly reduce any risk of flooding that might be caused by installation
of such screens.  Coupled with Plaintiffs' agreement that the screens should be
removed in any event when circumstances require to protect against flooding (Mr.

Cox admitted that such a design was possible) (App. 387-388; 286-287).) there is

no reason not to find that this alleged "harm" is insufficient to outweigh the

damage that would be occur from an Asian carp invasion of the Great Lakes.

Defendants' primary concerns with installing screens and raking machines

related to the time and expense associated with such an undertaking, noting that it

might take up to a year to contract for and would likely require some structural

modifications to the existing facilities.  (App. 382-383, 393-396.)  However, these

expenses are not "irreparable" harm and they pale in comparison to the grave and

truly irreparable harm that will occur if Asian carp establish a breeding population

in the Great Lakes, and the efforts that will be required to even attempt to control

that population.

Mr. Cox (App. 382-383) and Mr. Staudacher (App. 393-396) testified that

physical constraints in the existing structures at the Chicago Controlling Works

and O'Brien Lock and Dam could limit the Defendants' ability to install automatic

raking machines and removable screens at certain sluice gates, particularly if the

screen design was that proposed in Plaintiffs' Reply filed in support of its

preliminary injunction motion.[32]  But there is no evidence that these concerns

---

[32] Plaintiffs requested that the screens conform to specifications detailed in
Appendix A to the Corps' Interim III Report (App. 310), "or otherwise as will be as
effective at preventing Asian carp from passing through these structures as the
gates or screens specified in that Report."  (Dkt. #88, Reply in Support of P.I. Mtn.,
p. 62.)  Plaintiffs did not, and do not insist upon those particular specifications,

present insurmountable design problems. They can and should be addressed through timely development of appropriate engineering plans for screens and rakes adapted to the particular locations that will effectively deter the passage of adult Asian carp.

The Corps has also expressed concern with Plaintiffs' request that block nets be installed in the Little Calumet River. (App. 293-294.) This concern parallels the concern about sluice gate screens – that the nets could become clogged with debris and cause floods. (App. 293-294.) The lower court accepted these statements (S.App. 59) without accounting for Plaintiffs' logical suggestion that Defendants merely monitor the block nets and, if those nets become clogged with debris, either remove the debris or simply remove the net to prevent flooding, preferably after first installing one or more block nets lakeward of the clogged net to protect against the passage of Asian carp. This will require some effort, and minimal equipment cost (block nets cannot be that expensive), but again, such expense is not irreparable injury and when put in proper perspective, these costs are insignificant.

Finally, the lower court disagreed that it would be reasonable to temporarily close the Chicago and O'Brien locks as an interim measure, pending a permanent solution to the carp threat. Plaintiffs have pointed out that in fact the Chicago

---

which were intended solely to provide objective criteria, already identified by the Corps, for the screens' opening size and consequent ability to deter fish passage.

locks closed for badly needed repairs in November, 2010 for what the Corps has said will be a continuous five month period.  (S.App. 56.)  Obviously, the Corps has a plan for dealing with any potential flooding caused by such closure. It is using bulkheads that can be removed with a crane (S.App. 56) in the unlikely event that weather conditions would require opening the locks to release flood waters into Lake Michigan (the locks have only needed to be opened a total of nine times for such flood relief in the last 50 years; App. 392).  While the lower court had some concerns that using bulkheads would slow down the response to such a flood event, its main concern with this proposal seemed to be the increased cost and use of the Corps' "limited supply of bulkheads" which the court said would reduce the Corps' ability to respond to emergencies on the Mississippi River which are a "greater need" than blocking the spread of Asian carp.  (S.App. 57.)  Plaintiffs respectfully disagree that the evidence establishes that repairing locks on the Mississippi River should take precedence over the looming Asian carp threat.  In any event, the federal government has made it clear that it is willing to spend significant resources to reduce this threat (over $78 million is committed for this purpose; App. 307), so the cost of a few bulkheads should not prove a serious impediment to protecting the Great Lakes.  Moreover, as noted above, such expenses are not irreparable injury and cannot outweigh the ecological harm threatening the Great Lakes.

66

      **c.**      **Defendants presented no evidence, other than of some increased costs, that rebuts the assertion that police, fire, maritime and homeland security issues can be adequately addressed through careful planning.**

The City of Chicago and the Coast Guard have repeatedly asserted that closure of the Chicago and O'Brien locks would impair both emergency response functions and non-emergency patrols currently performed by the City and the Coast Guard. While Plaintiffs appreciate the seriousness of such concerns, it is apparent that they can be addressed by thoughtful planning and perhaps the duplication of some assets. The proof of this assertion is that, as noted above, the Chicago locks will be closed for five straight months starting in November, 2010. Plaintiffs believe that if plans can be developed to address all the police, fire and Coast Guard concerns described by the Defendants just so the lock can be closed to permit it to be repaired, there is no reason to believe that comparable plans cannot be developed to close the locks to assure that the Great Lakes ecosystem is not seriously harmed by an invasion of Asian carp. It may be inconvenient and may entail some expense to prepare and implement such plans, but the balance of harms tips decidedly in Plaintiffs' favor viewed in light of the potential environmental and economic disaster that looms over the Great Lakes region.

The Corps and the lower court (S.App. 58), contend that the five month closure is not comparable to the relief requested by Plaintiffs because the planned closure will occur in the "winter" season when boat traffic is slower through the

lock.  Even if this is true, it does not explain the obvious impact that lock closure

will have on the police and fire activities described by Defendants as critical to

public health and safety.  These needs will certainly continue through the winter

season, regardless of whether there is a high level of traffic in the waterway.  Yet,

the Defendants have undoubtedly devised a way to meet these critical needs for

five straight months with the lock closed.  It would not be unreasonable to use this

plan as the springboard for adapting to an extended closure of the locks.

Likewise, if there is a plan for providing emergency service while the

Chicago Lock is closed, there is no good reason why a similar plan could not be

adopted for the O'Brien Lock.[33]  While the Coast Guard does have a station near

there, it appears that the same is not true for the City police and fire departments.

Apparently the Coast Guard has a strategy for responding to emergencies and

carrying out all of its security functions in the Chicago River even when that lock

is closed.  Employing a similar strategy in the waterways south of the O'Brien

Lock thus seems feasible.  Alternatively, the Coast Guard could maintain a second

dock south of the O'Brien lock so it can moor a second vessel there to respond to

situations below the lock.  While the Corps asserts that the Coast Guard doesn't

---

[33] At the hearing the Corps acknowledged that, in addition to the planned several
month closure of the Chicago lock this coming fall, a similar closure of the O'Brien
Lock has been planned since 2005 and will be effectuated once funds are secured.
(App. 384-385.)  Presumably a similar public safety plan has been prepared by the
Corps for this closure as well.

have the funds to pursue such a course, this is just a matter of money.  Given the

promise of federal funds to address the invasion of Asian carp (over $78 million;

App. 307), it would seem possible for the Coast Guard to find a funding source for

these increased costs if they are truly necessary.

> **d.    The Defendants' estimates regarding the economic impact of the injunctive relief sought by Plaintiffs are seriously overstated.**

The lower court seemed to accept estimates presented by the Coalition that

closing the locks would cost the local economy "close to $4.7 billion." (S.App.

59.) The costs of lock closure was extensively addressed by John Taylor, Ph.D.,

Associate Professor of Supply Chain Management and Director of Supply Chain

Programs at Wayne State University, an expert in transportation and logistics, who

prepared two affidavits and a report in this matter.  (App. 215-285.)  According to

Dr. Taylor, the actual transportation-related impact to the Chicago region from

lock closure would be approximately $64-69 million per year.  In his first affidavit

submitted in the proceedings below, he summarized the bases for his conclusion:

> (a)    Only approximately seven million tons of cargo per year would be affected and some of this would incur relatively minor inconvenience.

> (b)    That affected volume represents less than one percent of all the freight traffic in the Chicago Region and only thirty percent of the total Port of Chicago traffic.

(c)     The affected barge traffic is the equivalent of two daily loaded rail unit trains in a region that has approximately 500 daily freight trains.

(d)     Truck traffic in Chicago would increase less than 1/10 of one percent.

(e)     Most of the affected cargo would continue to move on the inland waterway system, through the Lockport Locks, but would have to stop a few miles short of its former destination.

(f)     Most of the claimed environmental, air quality, safety, and energy benefits associated with barge transportation would continue since most of the barge traffic would continue.

(g)     Some of the affected cargo traffic may require transfer to another mode of transportation such as rail, truck, or pipeline at transload locations.  Such transfers are the norm in an intermodal transportation system (e.g., grain moves by truck to an elevator, by rail to a port, and by barge to an end user to an export location).  Indeed, much of the traffic in the inland waterway system already uses several modes.

(h)     The suggestion that other modes of transportation are not available is incorrect.  Virtually all of the major shippers have direct or proximity access to both rail and highway.  The assertion that there are not enough rail cars or trucks to handle the traffic is also very wrong.  There is more than sufficient capacity to handle seven million tons annually and it could readily be provided.  (App. 219-220.)

The trial court seemed to rely instead on the testimony of Dr. Schweiterman, as well as a report prepared by Dr. Schweiterman.  (Coalition Ex. 2.)  The extent of economic harm predicted by Dr. Schweiterman, however, was overstated, primarily because the bulk of it related to increased costs as a result of flooding, and expansion of the Chicago Tunnel and Reservoir Project (TARP).  (App. 397-

400.)  These costs are not relevant because, as set forth above, the relief requested

by Plaintiffs will not exacerbate flooding, and because in any event, the costs of

constructing TARP *will be incurred regardless of whether Plaintiffs' requested

relief is granted*.  In addition, another substantial component of Dr. Schweiterman's

estimated harm was based upon the no longer relevant assumption that

discretionary diversion would be prohibited, thereby impairing water quality and

property values.  (App. 399-400.)  Finally, as explained by Dr. Taylor, while Dr.

Schweiterman's estimate of direct transportation-related impacts is similar to Dr.

Taylor's estimate of $64-69 million (Dr. Schweiterman asserted that these costs

would be in the neighborhood of $89 million; App. 223-224), other aspects of his

analysis and conclusions were not well documented or were otherwise

questionable.  (App. 262-265.)

     The Corps, the Coalition and Wendella have also asserted that the O'Brien

and Chicago Locks should not be closed because it would adversely affect the

operation of commercial tour boats and private recreational boats.  Even if it would

be inconvenient for some of these tour boats owners to close the Chicago locks,

because the tours occur on both sides of the lock, separate river and lake tours

could be continued and it should be possible, if necessary, to transfer passengers

short distances on land, between boats docked in the river, and boats docked at

locations in Lake Michigan.  (App. 257.)  And it appears that both recreational and

tour boat operations through the Chicago Locks have significantly declined from the peak years of 1994-1995.  (App. 239.)  While there will be some increase in costs to accommodate the lock closures, and some level of inconvenience for the public, these costs cannot compare to the potential injury caused by Asian carp in the Great Lakes.

Besides the disparity in dollars between harm to the Chicago economy and the harm to the economies of all the other Great Lakes states and provinces, any injury from closing the locks will be temporary.  It will end when alternate means of transportation are engaged or when some other effective mechanism to protect the Great Lakes from Asian carp is put into place.  There would no doubt be economic injury, but the damage will be finite, and will be miniscule in comparison to the economic harm caused should Asian carp enter the Great Lakes. Weighing the undisputed fact that the scope of the potential injury to the other Great Lakes States is immense if nothing is done to prevent Asian carp from entering the Great Lakes, against the short-term economic harm to barge and recreational boating traffic, the balance tips decidedly in favor of Plaintiffs. Moreover, environmental damage presents a special concern when considering a motion for preliminary injunction:

> Environmental injury, by its nature, can seldom be adequately
> remedied by money damages and is often permanent or at least of
> long duration, i.e., irreparable. If such injury is sufficiently likely,

72

therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.[34]

The Corps, as well as virtually every other government agency, has recognized that the introduction of the Asian carp would be an ecological and economic disaster for the Great Lakes.  Weighing the immense scope of the potential injury to the environment and the regional Great Lakes economy is immense if nothing is done to prevent Asian carp from entering the Great Lakes, against a short-term economic harm to barge and recreational boating traffic, the balance tips decidedly in favor of Plaintiffs.

**II.    This Court should enter requested injunctive relief where the district court committed reversible error when it failed to make the mandatory Fed. R. Civ. P. 52(a)(2) findings and conclusions concerning Plaintiffs' request for an injunction requiring the Corps to expedite the preparation of a feasibility study of options for the permanent physical separation of the CAWS from Lake Michigan.**

**A.    The standard of review is *de novo*.**

The district court acknowledged that Plaintiffs had requested an additional preliminary injunction to that discussed above:

> Plaintiffs also ask the Court to enter an injunction requiring the Corps to expedite the preparation of a feasibility study which develops and evaluates options for the permanent physical separation of the CAWS from Lake Michigan at strategic locations to prevent the transfer of Asian Carp or other invasive species between the Mississippi River Basin and the Great Lakes Basin, and to order Defendants to implement, as soon as possible, permanent measures to physically separate Illinois waters from Lake Michigan.  (S.App. 3.)

---

[34] *Amoco Production Co. v. Gambell*, 480 U.S. 531, 545 (1987).

Despite this acknowledgment, and for reasons that are not explained in the court's decision, there is absolutely no further discussion or analysis of this request for preliminary injunctive relief, including no findings and conclusions as required by Fed. R. Civ. P. 52(a)(2). The failure to make such mandatory findings and conclusions is an error of law.[35] Errors of law are subject to *de novo* review by this Court.[36] The Rule 52(a)(2) findings and conclusions are mandatory when an injunction is granted or denied, requiring reversal when such findings and conclusions are not made.

The language of Rule 52(a) is concise and unambiguous:

a) Findings and Conclusions.

  (1) In General. In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.

---

[35] *Conair v. Automatik ApparateMaschinenbau*, 944 F.2d 862, 866 (Fed. Cir. 1991), cited by *Carmichael v. Basler Turbo Conversions, Inc*., 1992 U.S. App. LEXIS 1128 (7th Cir. 1992) (unpublished decision, copy attached) ("Failure to provide adequate findings is an error of law.")

[36] *Tober v. Graco Children's Prods.*, 431 F.3d 572, 579 (7th Cir. 2005) ("We review a district court's instruction to the jury for an abuse of discretion, unless the instruction was based on an error of law in which case our review is de novo."); *Chapman v. Maytag Corp.(In re Chapman)*, 297 F.3d 682, 689 (7th Cir. 2002) ("In this case, however, the district court first made determinations regarding Indiana law; such determinations of law are reviewed de novo. *Donovan v. Robbins*, 752 F.2d 1170, 1178 (7th Cir. 1985) ('Even when the standard is abuse of discretion, review for errors of law is plenary').").

(2) For an Interlocutory Injunction. In granting or **refusing** an interlocutory injunction, the court **must** similarly state the findings and conclusions that support its action.  (Emphasis added.)

The Federal Courts, including this Court, have consistently held that these findings and conclusions are mandatory.[37]  Where a trial court fails to make the mandatory findings and conclusions, appeal courts have not hesitated to vacate the lower court's decision.  See, *e.g., Brown, supra; Conair, supra; Carmichael, supra; Mayo, supra.*  Such should be the result in the case at hand where the trial court did not make findings and conclusions with regard to the Plaintiffs' request for a preliminary injunction requiring acceleration of the physical separation feasibility study.

### B.    The evidentiary record supports entry by this Court of a preliminary injunction accelerating the feasibility study.

#### 1.    The Court has authority to enter its own injunction.

---

[37] *Lawson Prods.*, 782 F.2d at 1436 ("During the course of deciding whether to grant the motion the district court must take a number of **non-discretionary actions**: . . .(2) it must make factual determinations on the basis of a fair interpretation of the evidence before the court; and (3) it must draw legal conclusions in accord with a principled application of the law.  *See, e.g., Zepeda v. INS*, 753 F.2d 719, 724-25 (9th Cir. 1983)") (emphasis added); *Brown v. Quinlan, Inc.*, 138 F.2d 228, 229 (7th Cir. 1943) ("Under Rule 52(a) of the Federal Rules of Procedure, it is the trial court's duty to make findings of fact and conclusions of law."); *Mayo v. Lakeland Highlands Canning Co.*, 309 U.S. 310, 316 (1940) ("It is of the highest importance to a proper review of the action of a court in granting or refusing a preliminary injunction that there should be fair compliance with Rule 52 (a) of the Rules of Civil Procedure.").

There is no question that when circumstances warrant and where the evidentiary record contains information sufficient for the Court to conduct an analysis of the preliminary injunction factors, the Court may do so.[38]

As noted above, the Court conducts a two-step analysis, first determining whether there is some likelihood of success on the merits and whether there is likely irreparable injury.  If so, then the Court applies the "sliding scale" to all four of the preliminary injunction factors, weighing and balancing these factors.  See Section I.B above.  When the Court conducts this analysis with regard to the requested injunction accelerating the feasibility study, it is clear that the threshold inquiry is satisfied, and when the factors are weighed, particularly in light of the fact that an injunction accelerating the feasibility study in no way can be seen to cause any of the alleged economic or public safety "harms" on which Defendants so heavily relied when opposing this motion, the Court should conclude that entry of the requested preliminary injunction is necessary and appropriate.

> **2.      Given the magnitude of the irreparable injury if Asian carp enter the Great Lakes, the likelihood that Plaintiffs will be granted relief on their claims, the recognition by Congress that a feasibility study must be done and the lack of harm to the public interest or to Defendants from accelerating such a study, this Court should enter a preliminary injunction requiring acceleration of the feasibility study.**

---

[38] *Girl Scouts of Manitou Council,* 549 F.3d 1087, citing *Meridian Mut. Ins. Co. v. Meridian Ins. Group*, 128 F.3d 1111, 1120 (7th Cir. 1997).

### a.    Plaintiffs are likely to succeed on the merits of their claims.

Plaintiffs have addressed at length above the reasons that the lower court incorrectly determined that they had not shown an adequate likelihood of success on the merits of their claims to warrant entry of a preliminary injunction. Those arguments will not be reiterated here. Plaintiffs note that in addition to the reasons explained earlier, however, the lower court's rationale is further deficient in the context of the request for a preliminary injunction accelerating the feasibility study because this study is absolutely consistent with the mandate from Congress that the Corps should determine the feasibility of "the range of options and techniques available to *prevent* the spread of aquatic nuisance species between the Great Lakes and Mississippi River Basins through the Chicago Sanitary and Ship Canal and other aquatic pathways".[39] The lower court expressly relied on the flawed notion that Plaintiffs had failed to show likelihood of success in part because it was legally impossible for the Corps' conduct that has been authorized by Congress to be a public nuisance. (S.App. 39-43.) As shown above, the lower court's conclusion in this regard is legally deficient. Nevertheless, it is clear in the context of the request for an injunction accelerating the feasibility study that this concern is entirely non-existent. As noted above, the Corps has been directed by Congress to complete the feasibility study. Requiring the Corps to expedite that study as a

---

[39] Pub. L. No. 110-114, 121 Stat. 1041 § 3061(d) (emphasis added).

means to protect the status quo of the Great Lakes free of a reproducing population of Asian carp in no way conflicts with Congressional intent.

There is therefore every reason to find that Plaintiffs have a substantial likelihood of success on the merits of their claims.

>    **b.    If the feasibility study is not accelerated, Plaintiffs will suffer irreparable harm.**

For the reasons detailed above, it is absolutely critical that a permanent solution to the Asian carp threat be implemented as a result of this litigation. Plaintiffs' underlying Complaint ultimately seeks a permanent injunction requiring the development and implementation of plans to physically separate the Mississippi River and Great Lakes Basins at strategic locations in the CAWS. As the record reflects, there is considerable scientific support for the proposition that the best and only reliable way to prevent the transfer of Asian carp and other invasive species between the basins is such a separation. Both Dr. Lodge (App. 330-333) and Dr. Newcomb (App. 128, 131-132) emphasized the importance of permanent separation of the basins, and of rapidly developing the information needed to plan for such a separation. And, as noted above, three members of the Expert Risk Assessment Panel identified permanent physical separation as the best means of preventing Asian carp invasion of the Great Lakes. (App. 204.)

Whatever that solution may be, it is also critical that the Corps begin and complete the feasibility study as soon as possible so that it can inform the remedy

selected by the court. As shown above, the threat of harm from the Asian carp is real and is imminent. While the other preliminary injunctive relief requested here is important to maintaining the status quo, it is not a substitute for a permanent solution to this danger. This is because the march of the Asian carp to the Great Lakes has been successful in large part because the carp are amazingly adaptable and persistent. Installing screens in sluice gates, installing block nets, using rotenone and even temporarily ceasing the opening of the locks will significantly reduce the risk of the threat, but the longer such measures are the only defense against the carp's advance, the more likely the fish will find a way to get into the Great Lakes. These are, after all, merely interim measures. The overwhelming weight of scientific evidence, and expressed Congressional intent, supports the need for a permanent solution to separating the Mississippi River Basin from the Great Lakes Basin.

It is therefore imperative that the implementation of a permanent solution to this threat occur as soon as humanly possible. The most logical means for determining what that permanent solution should be is utilization of the process that is already in place and funded for this very purpose – the feasibility study being conducted by the Corps pursuant to its authority under Section 3601 of the Water Resources Development Act of 2007. While Plaintiffs realize that such a study cannot be completed overnight, the Corps' latest projection is that it will not

79

have it done for at least five years.  (App. 346.)  Under the circumstances, this is just too long too wait and it is highly likely that the carp will find their way into Lake Michigan during this delay, even if some or all of the interim measures requested by Plaintiffs are put in place.  In their motion for preliminary injunction, Plaintiffs have delineated a graduated schedule for completion of this study that reasonably permits effective development and completion of the study, while at the same time minimizing the potential of an Asian carp invasion.  This study will require the Corps to complete the study more quickly than its current projections.

But it is also important that the schedule for completion of the study be put in place immediately.  Reducing the overall time for completion of the study is important, but just as important is starting the clock ticking so that the deadline arrives as soon as possible.  If the Corps is not ordered to complete the study in 18 months until the conclusion of the trial, by the time the deadline comes around, the carp could very well be reproducing in Lake Michigan.

Thus, granting the requested preliminary relief now is critically important to the avoidance of irreparable injury.  Given this showing, combined with the clear case that Plaintiffs have at the very least shown "some" likelihood of success on the merits, the Court should proceed to balancing the preliminary injunction factors.

**c.    Any harm to the public interest or to Defendants caused by acceleration of the feasibility study is insignificant.**

The lower court generally identified the "harms" that were relevant to its decision as public safety issues and economic impacts that would allegedly be caused by the injunctive relief requested by Plaintiffs.  Of course, the court did not describe or discuss those harms in the context of the request to accelerate the feasibility study as no findings or conclusions were made in this regard.  This Court does, however, have adequate record evidence to determine that there would be no significant harm to the public or the Defendants if the feasibility study is completed on the Plaintiffs' schedule.

The public safety issues identified by Defendants and the lower court primarily concerned potential flooding, and the inability of police, fire and other emergency responders to access the CAWS or the Lake Michigan shoreline if certain aspects of the requested injunction not related to the feasibility study, were implemented.  (S.App. 55-61.)  The concern is that closing the locks or putting screens in the sluice gates, and other related conduct, would either block the outflow of flood waters into Lake Michigan during significant storm events, or would slow the response of the operators of these facilities so that flooding would occur.  With regard to the emergency responders, the contention is that closing the locks would slow down the response to an emergency, and thereby endanger the

public.  Plaintiffs have shown above that these concerns are unfounded, and that it is possible to protect Lake Michigan through the use of grates in sluice gates, block nets and lock closures, while still protecting public safety.

Moreover, when the injunctive relief at issue is merely acceleration of the feasibility study, all of these concerns obviously fall by the wayside.  This requested relief imposes no burden whatsoever on public safety as it does not effect any change in the operation of the facilities of concern in the CAWS.

Similarly, the alleged harm to the Chicago area economy from grates in sluice gates and lock closure is entirely absent should the feasibility study be accelerated.

For these reasons, the balancing of the factors becomes lopsided when the injunctive relief in question is acceleration of the study.  When the non-existent harm to the public and Defendants from acceleration of the study is weighed against the serious irreparable injury to Plaintiffs and the general public from an Asian carp infestation of Lake Michigan, there is no contest.  Furthermore, Congress has already recognized that there is a need to conduct the feasibility study as a critical step toward protecting the environment from invasive species, including Asian carp.  Defendants will be hard pressed to argue that this Congressional intent expressed in the Water Resources Development Act of 2007 and in Section 126 of the Energy and Water Development and Related Agencies

82

Appropriation Act of 2010, does not establish a legitimate public interest in having the study completed sooner rather than later. This legislation adds additional weight to Plaintiffs' side of the scale.

Likewise, when this non-existent harm to the public interest and Defendants is weighed against the likelihood of success on the merits, even if it is only a "modest" likelihood of success as the trial court determined (S.App. 39, 61), it is still clear that the requested injunctive relief should be granted.

For these reasons, Plaintiffs respectfully request that the Court enter an injunction requiring the Corps to complete the feasibility study pursuant to the schedule set forth in Plaintiffs' Motion for Preliminary Injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court:

A.  Reverse the December 2, 2010 Order denying Plaintiffs' motion for preliminary injunction;

B.  Enter an Order granting the preliminary injunction requested by Plaintiffs in their August 17, 2010 Reply Brief (Dkt. 88), as modified in their October, 2010 Post-Hearing Memorandum in Support of Preliminary Injunction (App. 311-327), or in the alternative, remanding this matter to the district court for further consideration of Plaintiffs motion, and

C.  Grant Plaintiffs further relief as the Court finds appropriate and just.

<div style="margin-left:45%">

Respectfully submitted,

Bill Schuette
Attorney General

B. Eric Restuccia (49550)
Solicitor General

_____

Robert P. Reichel (P31878)
Louis B. Reinwasser (P37757)
Daniel P. Bock (P71246)
Assistant Attorneys General
Attorneys for Plaintiffs-Appellants
ENRA Division
P.O. Box 30755
Lansing, MI  48909
(517) 373-7540
reichelb@michigan.gov

**Attorneys for the State of Michigan**

</div>

J.B. VAN HOLLEN
Attorney General of Wisconsin

_____

pursuant to written authorization on
February 9, 2011
Cynthia R. Hirsch
Assistant Attorney General
State Bar #1012870

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-3861
(608) 266-2250 (Fax)
hirschcr@doj.state.wi.us

**Attorneys for State of Wisconsin**

LORI SWANSON
Attorney General of Minnesota

STEVEN M. GUNN
Deputy Attorney General

_____

*/s/*  Steven M. Gunn, by */s/* Robert P.
Reichel, pursuant to written authorization
on February 9, 2011
Steven M. Gunn (0038647)
Deputy Attorney General
David P. Iverson (0180944)
Assistant Attorney General
445 Minnesota St., #900
St. Paul, MN  55101-2127
(651) 757-1466
Steven.Gunn@state.mn.us
Dave.Iverson@state.mn.us

**Attorneys for State of Minnesota**

85

MICHAEL DEWINE
Attorney General of Ohio

_____

pursuant to written authorization on
February 9, 2011
Lee Ann Rabe
Dale T. Vitale
Michael L. Stokes
Daniel J. Martin
Assistant Attorneys General
Office of the Attorney General
30 East Broad Street
Columbus, OH  43215

LeeAnn.Rabe@ohioattorneygeneral.gov

**Attorneys for the State of Ohio**

WILLIAM H. RYAN, JR.
Acting Attorney General of Pennsylvania

_____

pursuant to written authorization on
February 9, 2011
J. Bart DeLone
Senior Deputy Attorney General
15th Floor, Strawberry Square
Harrisburg, PA  17120
(717) 783-3226

jdelone@attorneygeneral.gov

**Attorneys for Commonwealth of
Pennsylvania**

Dated:  February 9, 2011

## ADDENDUM – RELEVANT STATUTES

| Authority | Page No. |
|---|---|
| 5 U.S.C. § 551 | 88 |
| 5 U.S.C. § 701 | 90 |
| 5 U.S.C. § 702 | 91 |
| 5 U.S.C. § 706 | 92 |
| 16 U.S.C. § 4722 | 93 |
| 28 U.S.C. § 1292 | 99 |
| 28 U.S.C. § 1331 | 102 |
| 28 U.S.C. § 1332 | 103 |
| Public Law 110-114 (November 8, 2007) | 108 |
| Public Law 111-85 (October 28, 2009) | 110 |
| *Carmichael v Basler Turbo,* 1992 U.S. App. LEXIS 1128 | 112 |

5 USCS § 551

§ 551.  Definitions

For the purpose of this subchapter [5 USCS §§ 551 et seq.]--

  (1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include--

    (A) the Congress;

    (B) the courts of the United States;

    (C) the governments of the territories or possessions of the United States;

    (D) the government of the District of Columbia;

  or except as to the requirements of section 552 of this title [5 USCS § 552]--

    (E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

    (F) courts martial and military commissions;

    (G) military authority exercised in the field in time of war or in occupied territory; or

    (H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; chapter 2 of title 41 [41 USCS §§ 101 et seq.]; subchapter II of chapter 471 of title 49 [49 USCS §§ 47151 et seq.]; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix;

  (2) "person" includes an individual, partnership, corporation, association, or public or private organization other than an agency;

  (3) "party" includes a person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in an agency proceeding, and a person or agency admitted by an agency as a party for limited purposes;

  (4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

  (5) "rule making" means agency process for formulating, amending, or repealing a rule;

  (6) "order" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

  (7) "adjudication" means agency process for the formulation of an order;

(8) "license" includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission;

(9) "licensing" includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license;

(10) "sanction" includes the whole or a part of an agency--

(A) prohibition, requirement, limitation, or other condition affecting the freedom of a person;

(B) withholding of relief;

(C) imposition of penalty or fine;

(D) destruction, taking, seizure, or withholding of property;

(E) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees;

(F) requirement, revocation, or suspension of a license; or

(G) taking other compulsory or restrictive action;

(11) "relief" includes the whole or a part of an agency--

(A) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy;

(B) recognition of a claim, right, immunity, privilege, exemption, or exception; or

(C) taking of other action on the application or petition of, and beneficial to, a person;

(12) "agency proceeding" means an agency process as defined by paragraphs (5), (7), and (9) of this section;

(13) "agency action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act; and

(14) "ex parte communication" means an oral or written communication not on the public record with respect to which reasonable prior notice to all parties is not given, but it shall not include requests for status reports on any matter or proceeding covered by this subchapter [5 USCS §§ 551 etc.].

5 USCS § 701

§ 701.  Application; definitions

(a) This chapter [5 USCS §§ 701 et seq.] applies, according to the provisions thereof, except to the extent that--
   (1) statutes preclude judicial review; or
   (2) agency action is committed to agency discretion by law.

(b) For the purpose of this chapter [5 USCS §§ 701 et seq.]--
   (1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include--
      (A) the Congress;
      (B) the courts of the United States;
      (C) the governments of the territories or possessions of the United States;
      (D) the government of the District of Columbia;
      (E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;
      (F) courts martial and military commissions;
      (G) military authority exercised in the field in time of war or in occupied territory; or
      (H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; chapter 2 of title 41 [41 USCS §§ 101 et seq.]; subchapter II of chapter 471 of title 49 [49 USCS §§ 47151 et seq.]; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix, and
   (2) "person," "rule," "order," "license," "sanction," "relief," and "agency action" have the meanings given them by section 551 of this title [5 USCS § 551].

5 USCS § 702

§ 702.  Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 USCS § 706

§ 706.  Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

  (1) compel agency action unlawfully withheld or unreasonably delayed; and

  (2) hold unlawful and set aside agency action, findings, and conclusions found to be--

    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    (B) contrary to constitutional right, power, privilege, or immunity;

    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    (D) without observance of procedure required by law;

    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 USCS §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute; or

    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

16 USCS § 4722

§ 4722.  Aquatic nuisance species program

(a) In general. The Task Force shall develop and implement a program for waters of the United States to prevent introduction and dispersal of aquatic nuisance species; to monitor, control and study such species; and to disseminate related information.

(b) Content. The program developed under subsection (a) shall--
   (1) identify the goals, priorities, and approaches for aquatic nuisance species prevention, monitoring, control, education and research to be conducted or funded by the Federal Government;
   (2) describe the specific prevention, monitoring, control, education and research activities to be conducted by each Task Force member;
   (3) coordinate aquatic nuisance species programs and activities of Task Force members and affected State agencies;
   (4) describe the role of each Task Force member in implementing the elements of the program as set forth in this subtitle;
   (5) include recommendations for funding to implement elements of the program; and
   (6) develop a demonstration program of prevention, monitoring, control, education and research for the zebra mussel, to be implemented in the Great Lakes and any other waters infested, or likely to become infested in the near future, by the zebra mussel.

(c) Prevention.
   (1) In general. The Task Force shall establish and implement measures, within the program developed under subsection (a), to minimize the risk of introduction of aquatic nuisance species to waters of the United States, including--
      (A) identification of pathways by which aquatic organisms are introduced to waters of the United States;
      (B) assessment of the risk that an aquatic organism carried by an identified pathway may become an aquatic nuisance species; and
      (C) evaluation of whether measures to prevent introductions of aquatic nuisance species are effective and environmentally sound.
   (2) Implementation. Whenever the Task Force determines that there is a substantial risk of unintentional introduction of an aquatic nuisance species by an identified pathway and that the adverse consequences of such an introduction are

93

likely to be substantial, the Task Force shall, acting through the appropriate Federal agency, and after an opportunity for public comment, carry out cooperative, environmentally sound efforts with regional, State and local entities to minimize the risk of such an introduction.

(d) Monitoring. The Task Force shall establish and implement monitoring measures, within the program developed under subsection (a), to--

   (1) detect unintentional introductions of aquatic nuisance species;

   (2) determine the dispersal of aquatic nuisance species after introduction; and

   (3) provide for the early detection and prevention of infestations of aquatic nuisance species in unaffected drainage basins.

(e) Control.

   (1) In general. The Task Force may develop cooperative efforts, within the program established under subsection (a), to control established aquatic nuisance species to minimize the risk of harm to the environment and the public health and welfare. For purposes of this Act, control efforts include eradication of infestations, reductions of populations, development of means of adapting human activities and public facilities to accommodate infestations, and prevention of the spread of aquatic nuisance species from infested areas. Such control efforts shall be developed in consultation with affected Federal agencies, States, Indian Tribes, local governments, interjurisdictional organizations, and other appropriate entities. Control actions authorized by this section shall be based on the best available scientific information and shall be conducted in an environmentally sound manner.

   (2) Decisions. The Task Force or any other affected agency or entity may recommend that the Task Force initiate a control effort. In determining whether a control program is warranted, the Task Force shall evaluate the need for control (including the projected consequences of no control and less than full control); the technical and biological feasibility and cost-effectiveness of alternative control strategies and actions; whether the benefits of control, including costs avoided, exceed the costs of the program; the risk of harm to non-target organisms and ecosystems, public health and welfare; and such other considerations the Task Force determines appropriate. The Task Force shall also determine the nature and extent of control of target aquatic nuisance species that is feasible and desirable.

   (3) Programs. If the Task Force determines in accordance with paragraph (2) that control of an aquatic nuisance species is warranted, the Task Force shall develop a proposed control program to achieve the target level of control. A notice summarizing the proposed action and soliciting comments shall be published in the Federal Register, in major newspapers in the region affected, and in principal trade publications of the industries affected. Within 180 days of proposing a control

program, and after consultation with affected governmental and other appropriate entities and taking into consideration other comments received, the Task Force shall complete development of the proposed control program.

(f) Research.

  (1) Priorities. The Task Force shall, within the program developed under subsection (a), conduct research concerning--

    (A) the environmental and economic risks and impacts associated with the introduction of aquatic nuisance species into the waters of the United States;

    (B) the principal pathways by which aquatic nuisance species are introduced and dispersed;

    (C) possible methods for the prevention, monitoring and control of aquatic nuisance species; and

    (D) the assessment of the effectiveness of prevention, monitoring and control methods.

  (2) Protocol. Within 90 days of the date of enactment of this Act [enacted Nov. 29, 1990], the Task Force shall establish and follow a protocol to ensure that research activities carried out under this subtitle do not result in the introduction of aquatic nuisance species to waters of the United States.

  (3) Grants for research. The Task Force shall allocate funds authorized under this Act for competitive research grants to study all aspects of aquatic nuisance species, which shall be administered through the National Sea Grant College Program and the Cooperative Fishery and Wildlife Research Units. Grants shall be conditioned to ensure that any recipient of funds follows the protocol established under paragraph (2) of this subsection.

(g) Technical Assistance. The Task Force shall, within the program developed under subsection (a), provide technical assistance to State and local governments and persons to minimize the environmental, public health, and safety risks associated with aquatic nuisance species, including an early warning system for advance notice of possible infestations and appropriate responses.

(h) Education. The Task Force shall, with the program developed under subsection (a), establish and implement educational programs through Sea Grant Marine Advisory Services and any other available resources that it determines to be appropriate to inform the general public, State governments, governments of political subdivisions of States, and industrial and recreational users of aquatic resources in connection with matters concerning the identification of aquatic nuisance species, and control methods for such species, including the prevention of the further distribution of such species.

95

(i) Zebra mussel demonstration program.

(1) Zebra mussel.

(A) In general. The Task Force shall, within the program developed under subsection (a), undertake a program of prevention, monitoring, control, education and research for the zebra mussel to be implemented in the Great Lakes and any other waters of the United States infested or likely to become infested by the zebra mussel, including--

(i) research and development concerning the species life history, environmental tolerances and impacts on fisheries and other ecosystem components, and the efficacy of control mechanisms and means of avoiding or minimizing impacts;

(ii) tracking the dispersal of the species and establishment of an early warning system to alert likely areas of future infestations;

(iii) development of control plans in coordination with regional, State and local entities; and

(iv) provision of technical assistance to regional, State and local entities to carry out this section.

(B) Public facility research and development. The Assistant Secretary, in consultation with the Task Force, shall develop a program of research, technology development, and demonstration for the environmentally sound control of zebra mussels in and around public facilities. The Assistant Secretary shall collect and make available, through publications and other appropriate means, information pertaining to such control methods.

(C) Voluntary guidelines. Not later than 1 year after the date of enactment of this subparagraph [enacted Oct. 26, 1996], the Task Force shall develop and submit to the Secretary voluntary guidelines for controlling the spread of the zebra mussel and, if appropriate, other aquatic nuisance species through recreational activities, including boating and fishing. Not later than 4 months after the date of such submission, and after providing notice and an opportunity for public comment, the Secretary shall issue voluntary guidelines that are based on the guidelines developed by the Task Force under this subparagraph.

(2) Dispersal containment analysis.

(A) Research. The Administrator of the Environmental Protection Agency, in cooperation with the National Science Foundation and the Task Force, shall provide research grants on a competitive basis for projects that--

(i) identify environmentally sound methods for controlling the dispersal of aquatic nuisance species, such as the zebra mussel; and

(ii) adhere to research protocols developed pursuant to subsection (f)(2).

(B) Authorization of appropriations. There are authorized to be appropriated to

the Environmental Protection Agency to carry out this paragraph, $ 500,000.

  (3) Dispersal barrier demonstration.

    (A) In general. The Assistant Secretary, in consultation with the Task Force, shall investigate and identify environmentally sound methods for preventing and reducing the dispersal of aquatic nuisance species between the Great Lakes-Saint Lawrence drainage and the Mississippi River drainage through the Chicago River Ship and Sanitary Canal, including any of those methods that could be incorporated into the operation or construction of the lock system of the Chicago River Ship and Sanitary Canal.

    (B) Report. Not later than 18 months after the date of enactment of this paragraph [enacted Oct. 26, 1996], the Assistant Secretary shall issue a report to the Congress that includes recommendations concerning--

      (i) which of the methods that are identified under the study conducted under this paragraph are most promising with respect to preventing and reducing the dispersal of aquatic nuisance species; and

      (ii) ways to incorporate those methods into ongoing operations of the United States Army Corps of Engineers that are conducted at the Chicago River Ship and Sanitary Canal.

    (C) Authorization of appropriations. There are authorized to be appropriated to the Department of the Army such sums as are necessary to carry out the dispersal barrier demonstration project directed by this paragraph.

  (4) Contributions. To the extent allowable by law, in carrying out the studies under paragraphs (2) and (3), the Administrator of the Environmental Protection Agency and the Secretary of the Army may enter into an agreement with an interested party under which that party provides in kind or monetary contributions for the study.

  (5) Technical assistance. The Great Lakes Environmental Research Laboratory of the National Oceanic and Atmospheric Administration shall provide technical assistance to appropriate entities to assist in the research conducted pursuant to this subsection.


(j) Implementation.

  (1) Regulations. The Director, the Secretary, and the Under Secretary may issue such rules and regulations as may be necessary to implement this section.

  (2) Participation of others. The Task Force shall provide opportunities for affected Federal agencies which are not part of the Task Force, State and local government agencies, and regional and other entities with the necessary expertise to participate in control programs. If these other agencies or entities have sufficient authority or jurisdiction and expertise and where this will be more efficient or effective, responsibility for implementing all or a portion of a control program may

97

be delegated to such agencies or entities.

(k) Reports.

  (1) Not later than 12 months after the date of enactment of this Act [enacted Nov. 29, 1990], the Task Force shall submit a report describing the program developed under subsection (a), including the research protocol required under subsection (f)(2), to the Congress.

  (2) On an annual basis after the submission of the report under paragraph (1), the Task Force shall submit a report to the Congress detailing progress in carrying out this section.

28 USCS § 1292

§ 1292.  Interlocutory decisions

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

  (1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

  (2) Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

  (3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

(c) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction--

  (1) of an appeal from an interlocutory order or decree described in subsection (a) or (b) of this section in any case over which the court would have jurisdiction of an appeal under section 1295 of this title [28 USCS § 1295]; and

  (2) of an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable to the United States Court of Appeals for the Federal Circuit and is final except for an accounting.

(d) (1) When the chief judge of the Court of International Trade issues an order under the provisions of section 256(b) of this title [28 USCS § 256(b)], or when any judge of the Court of International Trade, in issuing any other interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

(2) When the chief judge of the United States Court of Federal Claims issues an order under section 798(b) of this title [28 USCS § 798(b)], or when any judge of the United States Claims Court [United States Court of Federal Claims], in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

(3) Neither the application for nor the granting of an appeal under this subsection shall stay proceedings in the Court of International Trade or in the Claims Court [Court of Federal Claims], as the case may be, unless a stay is ordered by a judge of the Court of International Trade or of the Claims Court [Court of Federal Claims] or by the United States Court of Appeals for the Federal Circuit or a judge of that court.

(4) (A) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction of an appeal from an interlocutory order of a district court of the United States, the District Court of Guam, the District Court of the Virgin Islands, or the District Court for the Northern Mariana Islands, granting or denying, in whole or in part, a motion to transfer an action to the United States Claims Court [United States Court of Federal Claims] under section 1631 of this title [28 USCS § 1631].

(B) When a motion to transfer an action to the Claims Court [Court of Federal Claims] is filed in a district court, no further proceedings shall be taken in the district court until 60 days after the court has ruled upon the motion. If an appeal is taken from the district court's grant or denial of the motion, proceedings shall be further stayed until the appeal has been decided by the Court of Appeals for the Federal Circuit. The stay of proceedings in the district court shall not bar the granting of preliminary or injunctive relief, where appropriate and where expedition is reasonably necessary. However, during the period in which proceedings are stayed as provided in this subparagraph, no transfer to the Claims

Court [Court of Federal Claims] pursuant to the motion shall be carried out.

(e) The Supreme Court may prescribe rules, in accordance with section 2072 of this title [28 USCS § 2072], to provide for an appeal of an interlocutory decision to the courts of appeals that is not otherwise provided for under subsection (a), (b), (c), or (d).

28 USCS § 1331

§ 1331.  Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

28 USCS § 1332

§ 1332.  Diversity of citizenship; amount in controversy; costs

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $ 75,000, exclusive of interest and costs, and is between--
  (1) Citizens of different States;
  (2) citizens of a State and citizens or subjects of a foreign state;
  (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and
  (4) a foreign state, defined in section 1603(a) of this title [28 USCS § 1603(a)], as plaintiff and citizens of a State or of different States.

For the purposes of this section, section 1335 [28 USCS § 1335], and section 1441 [28 USCS § 1441], an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled.

(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $ 75,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

(c) For the purposes of this section and section 1441 of this title [28 USCS § 1441]--
  (1) a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business, except that in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of the State of which the insured is a citizen, as well as of any State by which the insurer has been incorporated and of the State where it has its principal place of business; and
  (2) the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent.

(d) (1) In this subsection--

(A) the term "class" means all of the class members in a class action;

(B) the term "class action" means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action;

(C) the term "class certification order" means an order issued by a court approving the treatment of some or all aspects of a civil action as a class action; and

(D) the term "class members" means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

(2) The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $ 5,000,000, exclusive of interest and costs, and is a class action in which--

(A) any member of a class of plaintiffs is a citizen of a State different from any defendant;

(B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

(C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

(3) A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of--

(A) whether the claims asserted involve matters of national or interstate interest;

(B) whether the claims asserted will be governed by laws of the State in which the action was originally filed or by the laws of other States;

(C) whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction;

(D) whether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants;

(E) whether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States; and

(F) whether, during the 3-year period preceding the filing of that class action, 1

or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

(4) A district court shall decline to exercise jurisdiction under paragraph (2)--

(A) (i) over a class action in which--

(I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

(II) at least 1 defendant is a defendant--

(aa) from whom significant relief is sought by members of the plaintiff class;

(bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

(cc) who is a citizen of the State in which the action was originally filed; and

(III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

(ii) during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons; or

(B) two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

(5) Paragraphs (2) through (4) shall not apply to any class action in which--

(A) the primary defendants are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; or

(B) the number of members of all proposed plaintiff classes in the aggregate is less than 100.

(6) In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $ 5,000,000, exclusive of interest and costs.

(7) Citizenship of the members of the proposed plaintiff classes shall be determined for purposes of paragraphs (2) through (6) as of the date of filing of the complaint or amended complaint, or, if the case stated by the initial pleading is not subject to Federal jurisdiction, as of the date of service by plaintiffs of an amended pleading, motion, or other paper, indicating the existence of Federal jurisdiction.

(8) This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that action.

(9) Paragraph (2) shall not apply to any class action that solely involves a claim--

(A) concerning a covered security as defined under 16(f)(3) of the Securities Act of 1933 (15 U.S.C. 78p(f)(3)) and section 28(f)(5)(E) of the Securities

Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

(B) that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

(C) that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).

(10) For purposes of this subsection and section 1453 [28 USCS § 1453], an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.

(11) (A) For purposes of this subsection and section 1453 [28 USCS § 1453], a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs.

(B) (i) As used in subparagraph (A), the term "mass action" means any civil action (except a civil action within the scope of section 1711(2) [28 USCS § 1711(2)]) in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).

(ii) As used in subparagraph (A), the term "mass action" shall not include any civil action in which--

(I) all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous to that State;

(II) the claims are joined upon motion of a defendant;

(III) all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action; or

(IV) the claims have been consolidated or coordinated solely for pretrial proceedings.

(C) (i) Any action(s) removed to Federal court pursuant to this subsection shall not thereafter be transferred to any other court pursuant to section 1407 [28 USCS § 1407], or the rules promulgated thereunder, unless a majority of the plaintiffs in the action request transfer pursuant to section 1407 [28 USCS § 1407].

(ii) This subparagraph will not apply--

(I) to cases certified pursuant to rule 23 of the Federal Rules of Civil Procedure; or

      (II) if plaintiffs propose that the action proceed as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure.

    (D) The limitations periods on any claims asserted in a mass action that is removed to Federal court pursuant to this subsection shall be deemed tolled during the period that the action is pending in Federal court.

(e) The word "States", as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico.

UNITED STATES PUBLIC LAWS
110th Congress -- 1st Session
(c) 2007, LEXISNEXIS, A DIVISION OF REED ELSEVIER INC. AND REED ELSEVIER
PROPERTIES INC.


PUBLIC LAW 110-114 [H.R. 1495]
NOV. 8, 2007
WATER RESOURCES DEVELOPMENT ACT OF 2007

110 P.L. 114; 121 Stat. 1041; 2007 Enacted H.R. 1495; 110 Enacted H.R. 1495

An Act


To provide for the conservation and development of water and related resources, to authorize the Secretary of the Army to construct various projects for improvements to rivers and harbors of the United States, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress <<NOTE: Water Resources Development Act of 2007. Intergovernmental relations. 33 USC 2201 note.>> assembled . . .

SEC. 3061. CHICAGO SANITARY AND SHIP CANAL DISPERSAL BARRIERS PROJECT, ILLINOIS.

(a) Treatment as Single Project.--The Chicago Sanitary and Ship Canal Dispersal Barrier Project (in this section referred to as "Barrier I"), as in existence on the date of enactment of this Act and constructed as a demonstration project under section 1202(i)(3) of the Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990 ( 16 U.S.C. 4722(i)(3)), and the project relating to the Chicago Sanitary and Ship Canal Dispersal Barrier, authorized by section 345 of the District of Columbia Appropriations Act, 2005 (Public Law 108-335; 118 Stat. 1352) (in this section referred to as "Barrier II") shall be considered to constitute a single project.

(b) Authorization.--

(1) In general.--The Secretary, at Federal expense, shall--

(A) upgrade and make permanent Barrier I;

(B) construct Barrier II, notwithstanding the project cooperation agreement with the State of Illinois dated June 14, 2005;

(C) operate and maintain Barrier I and Barrier II as a system to optimize effectiveness;

(D) conduct, in consultation with appropriate Federal, State, local, and nongovernmental entities, a study of a range of options and technologies for reducing impacts of hazards that may reduce the efficacy of the Barriers; and

(E) provide to each State a credit in an amount equal to the amount of funds contributed by the State toward Barrier II.

(2) Use of credit.--A State may apply a credit provided to the State under paragraph (1)(E) to any cost sharing responsibility for an existing or future Federal project carried out by the Secretary in the State.

(c) Conforming Amendment.--Section 345 of the District of Columbia Appropriations Act, 2005 (Public Law 108-335;    118 Stat. 1352) is amended to read as follows:

"SEC. 345. CHICAGO SANITARY AND SHIP CANAL DISPERSAL BARRIER, ILLINOIS.

"There <<NOTE: Appropriation authorization.>> are authorized to be appropriated such sums as may be necessary to carry out the Barrier II element of the project for the Chicago Sanitary and Ship Canal Dispersal Barrier, Illinois, initiated pursuant to section 1135 of the Water Resources Development Act of 1986 ( 33 U.S.C. 2294 note;    100 Stat. 4251).".

(d) Feasibility Study.--The Secretary, in consultation with appropriate Federal, State, local, and nongovernmental entities, shall conduct, at Federal expense, a feasibility study of the range of options and technologies available to prevent the spread of aquatic nuisance species between the Great Lakes and Mississippi River Basins through the Chicago Sanitary and Ship Canal and other aquatic pathways.

UNITED STATES PUBLIC LAWS
111th Congress -- 1st Session
(c) 2009, LEXIS-NEXIS, A DIVISION OF REED ELSEVIER INC. AND REED
ELSEVIER PROPERTIES INC.

PUBLIC LAW 111-85 [H.R. 3183]
OCT. 28, 2009
ENERGY AND WATER DEVELOPMENT AND RELATED AGENCIES
APPROPRIATIONS ACT 2010

111 P.L. 85; 123 Stat. 2845; 2009 Enacted H.R. 3183; 111 Enacted H.R. 3183

BILL TRACKING REPORT:      111 Bill Tracking H.R. 3183
FULL TEXT VERSION(S) OF BILL:  111 H.R. 3183

An Act

Making appropriations for energy and water development and related agencies for
the fiscal year ending September 30, 2010, and for other purposes.

  Be it enacted by the Senate and House of Representatives of the United States of
America in Congress assembled, That the following sums are appropriated, out of
any money in the Treasury not otherwise appropriated, for energy and water
development and related agencies for the fiscal year ending September 30, 2010,
and for other purposes, namely:

TITLE I
CORPS OF ENGINEERS--CIVIL
DEPARTMENT OF THE ARMY
Corps of Engineers--Civil

The following appropriations shall be expended under the direction of the
Secretary of the Army and the supervision of the Chief of Engineers for authorized
civil functions of the Department of the Army pertaining to rivers and harbors,
flood and storm damage reduction, shore protection, aquatic ecosystem restoration,
and related efforts . . . .

Sec. 126. During the 1-year period beginning on the date of enactment of this Act,
the Secretary of the Army shall implement measures recommended in the efficacy
study, or provided in interim reports, authorized under section 3061 of the Water

110

Resources Development Act of 2007 (  121 Stat. 1121), with such modifications or emergency measures as the Secretary of the Army determines to be appropriate, to prevent aquatic nuisance species from bypassing the Chicago Sanitary and Ship Canal Dispersal Barrier Project referred to in that section and to prevent aquatic nuisance species from dispersing into the Great Lakes.



LEXSEE 1992 U.S.APP. LEXIS 1128

**ELSA I. CARMICHAEL, BARRY W. WILSON, GEOFFREY WILSON, et al., Plaintiffs-Appellants, v. BASLER TURBO CONVERSIONS, INCORPORATED, BASLER FLIGHT SERVICES, INCORPORATED, WARREN BASLER, et al., Defendants-Appellees.**

**No. 91-3278**

**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

*1992 U.S. App. LEXIS 1128*

**December 11, 1991, Argued**
**January 24, 1992, Decided**

**NOTICE:**     [*1]  UNPUBLISHED ORDER NOT TO BE CITED PER SEVENTH CIRCUIT RULE 53.

**SUBSEQUENT HISTORY:**     Reported as Table Case at *952 F.2d 1398, 1992 U.S. App. LEXIS 11703.*

**PRIOR HISTORY:**     Appeal from the United States District Court for the Eastern District of Wisconsin. Nos. 91 C 480 and *91 C 496.*  Thomas J. Curran, Judge.

**JUDGES:**  Before Hon. JOEL M. FLAUM, Circuit Judge, Hon. KENNETH F. RIPPLE, Circuit Judge, Hon. HUBERT L. WILL, Senior District Judge [*]

    *  The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

**OPINION**

    *ORDER*

    This case is before us on appeal from a denial of a preliminary injunction. For the following reasons, we vacate the judgment and remand the case to the district court.

I.  Background

    On the basis of the record before us, it appears that the parties went into business together to convert DC-3 aircraft into modern turboprop planes.  They formed two corporations: Basler Turbo Conversions, Inc. (BTC), which was to develop the needed technology and manufacture "kits" for the conversion of the airplanes; and Innovair Aviation Limited (Innovair), which, under a licensing agreement with BTC, was to have exclusive foreign rights to manufacture kits and convert aircraft and exclusive foreign sales rights except for certain sales [*2]  involving the U.S. government.  BTC is owned 51% by defendants and 49% by plaintiffs, while Innovair is owned 51% by plaintiffs and 49% by defendants.  A third corporation, Basler Flight Service, owned wholly by the defendants, had a licensing agreement with BTC which granted it exclusive distribution rights in the United States and rights to certain foreign sales negotiated through the United States government.  The parties became embroiled in quarrels and lawsuits.  In the midst of these suits, the plaintiffs asked the district court for a preliminary injunction for specific enforcement of an agreement between BTC and Innovair which required BTC to provide to Innovair the technological information relating to conversion of the airplanes.

II.  District Court Proceedings

    After Innovair moved for a preliminary injunction, the district court issued an order scheduling a hearing for September 11, 1991.  Each side had forty-five minutes to make their presentation. If either side wished to present

live testimony, it was required to serve upon the opposing party and file with the court a list of witnesses and the anticipated testimony. The district court also directed counsel to file [*3] a statement of uncontested facts. App. at 84-85. (Statement of uncontested facts, App. at 86).

At the hearing, no live testimony was taken. The parties had filed numerous, conflicting affidavits, documents and correspondence. Several affidavits were filed the day before the hearing. After the parties made their forty-five minute presentations, the district court orally denied the preliminary injunction, stating that on the basis of the information before it, it could not find that "Innovair had a substantial probability of success" or that "there [was] any evidence that there isn't an adequate remedy at law." Blue App. at 105. A brief written order was issued the same day.

## III. Analysis

### A. Standard for granting or denying preliminary injunction

"The district court must consider a number of factors in deciding whether to grant a preliminary injunction: 'Before a preliminary injunction will issue, the movant must show, as a threshold matter, that: (1) they have no adequate remedy at law; (2) they will suffer irreparable harm if the injunction is not granted; and (3) they have *some* likelihood of success on the merits in the sense that their "chances are better than [*4] negligible."'" *National People's Action v. Village of Wilmette, 914 F.2d 1008, 1010 (7th Cir. 1990)* (quoting *Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386-87 (7th Cir. 1984), cert. denied, 111 S. Ct. 1311) (1991).* "If the movant can meet this threshold burden, the inquiry then becomes a "sliding scale" analysis of the harm to the parties and the public from the grant or denial of the injunction and the actual likelihood of success on the merits." *Id. at 1011.*

"During the course of deciding whether to grant the motion the district court must take a number of non-discretionary actions: (1) it must evaluate the traditional factors enunciated in the case law; (2) it must make factual determinations on the basis of a fair interpretation of the evidence before the court; and (3) it must draw legal conclusions in accord with a principled application of the law." *Lawson Products, Inc. v. Avnet, Inc., 782 F.2d 1429, 1436 (7th Cir. 1986).* Once the district court has accomplished these non-discretionary tasks, it must make a "classic discretionary decision" "involving how much weight to [*5] give individual components of the calculus and to what direction the balance of equity tips." *Id.*

### B. Standard for review

A district court's determination to grant or deny a preliminary injunction is reviewed under an abuse of discussion standard. However, the standard is "tailored to the various functions that the district court must perform in fulfillment of its responsibilities." *National People's Action, 914 F.2d at 1011* (quoting *Thornton v. Barnes, 890 F.2d 1380, 1384 (7th Cir. 1989).* Appellate review "varies with the nature of the lower court decision." "When a court of appeals considers a preliminary injunction order, which should set forth the judge's reasoning under *Fed. R. Civ. P. 65(d),* the factual determinations are reviewed under a clearly erroneous standard and the necessary legal conclusions are given *de novo* review." *Lawson, 782 F.2d at 1437.* "The ultimate evaluation and balancing of the equitable factors is a highly discretionary decision and one to which this court must give substantial deference." *Id. Id.* In the absence of an error of law or a clearly erroneous factual determination, [*6] "the district judge's weighing of the equities should be disturbed on appeal only in the rarest of cases." *Id.* However, "clearly, a factual or legal error may alone be sufficient to establish that the court 'abused its discretion' in making its final determination." *Id.*

As we noted in discussing the abuse of discretion standard in the context of Rule 11, "'review under the abuse of discretion standard does not mean no appellate review. . . . Judges should always reflect seriously upon the nuances of the particular case. . . .'" *Mars Steel Corp. v. Continental Bank N.A., 880 F.2d 928, 936 (7th Cir. 1989)* (quoting *in re Ronco, Inc., 838 F.2d 212, 217-18 (7th Cir. 1988).* "Until discretion has been taken seriously in the district court and exercised conscientiously, the basis for deference is missing." *Id.* In reviewing the grant or denial of a preliminary injunction, we have "an obligation under *Rule 52 (a)* to engage in a comprehensive review of the documentary evidence to determine if clear error has been committed." *Lawson Products, Inc. v. Avnet, Inc., 782 F.2d 1429, 1439 (7th Cir. 1986)* (citing *Anderson v. City of Bessemer City, 470 U.S. 564, 581 (1985)* [*7] (Powell, J., concurring)). "Thus, the appellate role is not to rubber stamp the lower court's determination." *Lawson, 782 F.2d at 1440.*

The present case presents several problems. First, in assessing the movant's likelihood of success on the merits, the district court used a standard of substantial likelihood. As noted above, this circuit has determined that the proper standard is "some" likelihood of success on the merits, which means merely a "more than negligible" chance of winning the lawsuit. In orally denying the injunction from the bench, the district court

twice stated that the standard it applied was one of substantial likelihood of success. In the brief written order, issued the same day, the district court used the phrase a "reasonable likelihood of success," but gave no indication that it had reassessed the movant's chances of success under a different standard from that announced initially.

The use of an erroneous legal standard in evaluating the movant's chances of likelihood of success on the merits may in itself constitute an abuse of discretion. *American Can Co. v. Mansukhani, 742 F.2d 314, 326 (7th Cir. 1984)*; *Lawson, 782 F.2d at 1437* [*8] (quoting *Zepeda v. INS, 753 F.2d 719, 724 (9th Cir. 1983)*. However, if the district court had found, without clearly erroneous factual determinations or other legal error, an absence of the other factors a movant for preliminary injunction must show, we would uphold his denial of the preliminary injunction in spite of the error. *See Cox v. City of Chicago, 868 F.2d 217 (7th Cir. 1989)* ("If a plaintiff fails to meet just one of the prerequisites for a preliminary injunction, the injunction must be denied.") But in evaluating the district court's determinations on the other factors required for a preliminary injunction, we are faced with a different problem -- the very scanty factual findings made by the district court. Even given the highly discretionary nature of the district court's decision to grant or deny a preliminary injunction, and the limited scope of our review, we find it impossible to perform the task assigned to us.

*Rule 52(a) of the Federal Rules of Civil Procedure* provides that "in granting or refusing interlocutory injunctions the courts shall . . . set forth the findings of fact and conclusions of law which constitute the [*9] grounds of its action." *Fed. R. Civ. Pro. 52(a)*. This setting forth of findings of fact and conclusions of law is of crucial importance to our ability to review the grant or denial of a preliminary injunction. *See Tekkno Laboratories, Inc. v. Perales, 933 F.2d 1093, 1097 (2d Cir. 1991)*. As the Supreme Court stated in *Mayo v. Lakeland Highlands Canning Co., 309 U.S. 310, 316 (1940)*, "it is of the highest importance to a proper review of the action of a court in granting or refusing a preliminary injunction that there should be fair compliance with *Rule 52(a)* of the Rules of Civil Procedure." "Explicit findings of fact upon which the conclusion of the court was based" "are obviously necessary to the intelligent and orderly presentation and proper disposition of an appeal." *Mayo, 309 U.S. at 317*. The findings required to support the grant or denial of a preliminary injunction must be "sufficiently comprehensive and pertinent to the issue to form a basis for the decision." *Conair v. Automatik Apparate-Maschinenbau, 944 F.2d 862, 866 (Fed. Cir. 1991)* (quoting *Oakley, Inc. v. International Tropic-Cal, Inc.,*

*923 F.2d 167, 168 (Fed. Cir. 1991)*. [*10] "Otherwise this court cannot conduct a meaningful review and the injunction must be vacated." *Id.* (citing *Pretty Punch Shoppettes, Inc., 844 F.2d 782, 784-85 (Fed. Cir. 1988)*); "Failure to provide adequate findings is an error of law." *Id.*

As the Fifth Circuit has pointed out, *Rule 52(a)* does not state expressly "whether the court's findings must be 'extensive,' or whether a 'sketchy pronouncement' will suffice." *Rex Oil, Ltd. v. M/V Jacinth, 873 F.2d 82, 87 (5th Cir. 1989)*. Yet a consensus among the circuits clearly exists. "The trial court need only make brief, definite, pertinent findings and conclusions on the contested matters." *United States v. Forness, 125 F.2d 928 (2d cir. 1942), cert. denied, 316 U.S. 694 (1942)* (quoted by *Rex Oil, 873 F.2d at 87-88*). There is "no necessity for over-elaboration of detail or particularization of facts." *Id.*; *see also Rex Oil, 873 F.2d at 87-88*. Moreover, as the Second Circuit has held, "we may proceed with our review despite inadequate findings if we 'can discern enough solid facts from the record to enable [*11] us to render a decision.'" *Tekkno Laboratories, Inc. v. Perales, 933 F.2d 1093 (2d Cir. 1991)* (citations omitted). However, "we will normally vacate the order if the findings and the record are not sufficient to enable us to be sure of the basis of the decision below." *Id.* In short, while what is sufficient will vary from case to case, the findings of the district court must be sufficient for our review.

In the present case, the district court orally denied the preliminary injunction, stating that "there actually are so many side issues here that defy resolution on the basis of affidavits, and I suspect may defy resolution up to the time of trial. But, in any event, I cannot find on the basis of the information before me that Innovair has a substantial probability of success." On the issue of whether there was an adequate remedy at law, the court stated, "I might also point out that it seems to me that it's going to be necessary through the discovery process to sort out the various claims and find out which have a sound foundation and which don't. And until that is done, I can't find that there is any evidence that there isn't an adequate remedy at law [*12] here with, as counsel points out, the parties owning substantial minority interests in each other's companies." Appellants' App. at 105. No further factual findings in regard to these issues were provided by the court in its written order. This state of the record leaves us in a dilemma not unlike that which confronted the Federal Circuit in *Pretty Punch Shoppettes, Inc. v. Hauk, 844 F.2d 782, 784 (Fed. Cir. 1988)*:

> In denying the preliminary injunction, the trial court stated that it was "not

114

convinced as to the probability of [Pretty Punch] prevailing on the merits" . . . because there were "too many issues of fact yet to be determined." These statements represent the extent of the trial court's findings, and do not explain why Pretty Punch had not established a reasonable likelihood of success on the issue of infringement. Pretty Punch's expert testified in detail why Hauk's needle infringed the claims of the '445 patent; both sides briefed the infringement issue, yet the trial court provided this court with no guidance as to why and how it arrived at its conclusion. We have no basis for evaluating what facts entered into the trial court's infringement [*13] analysis, or if that analysis comports with the standards articulated by this court.

The present case concerns a complex business arrangement; it requires a more detailed factual analysis than some. We give a summary of some of the claims and allegations involved. In their original complaint, the plaintiffs alleged that, as directors and officers of BTC, the defendants had acted improperly to benefit BFS, which is wholly owned by the defendants, to the detriment of BTC, which is owned 51% by defendants and 49% by plaintiffs. The plaintiffs asserted a shareholder derivative claim, as well as claims for breach of fiduciary duty against defendants Warren and Patricia Basler, for breach of contract against BFS, conspiracy, corporate dissolution, and a pattern of fraudulent conduct in violation of *Wis. Stat. § 946.83*. Later, the plaintiffs asked BTC to provide technological information under a technology licensing agreement between BTC and Innovair and received in reply a notification that the agreement was terminated. They then moved to amend their complaint to include a claim for breach of the licensing agreement and at the same time moved for a preliminary injunction to compel [*14] BTC to perform under the agreement. [1]

1   At the same time it denied the preliminary injunction, the district court gave the plaintiffs permission to amend their complaint. They have now done so, and the defendants have counterclaimed, seeking an injunction against the plaintiffs enjoining them from "conspiring with or directing others to misappropriate, destroy, disclose or use BTC's trade secrets;" An earlier case brought by BTC against Elsa Carmichael and Barry Wilson has been consolidated with the present case. In that case, which was originally brought in Wisconsin state court, BTC sought a declaratory judgment that there were no grounds for a judicial dissolution of Basler Turbo pursuant to *Wis. Stat. § 180.1430(2)*. In addition to these suits between the parties, there is a suit pending in federal court in Arizona concerning the federal government's seizure of the technology license for the airplane conversions, and a suit brought by BTC against several former employees for theft of trade secrets.

In support of their motion for a preliminary injunction, the plaintiffs argued before [*15] the district court that the terms of the agreement clearly obligated the defendants to turn over the technology, and that they themselves had performed their side of the agreement (payment of $ 1,675,000). In addition, the plaintiffs contended that they were without an adequate remedy at law and that, if the injunction were not granted, they would suffer irreparable harm because without the technology they would soon be out of business. The defendants disputed the allegation that plaintiffs had paid in full for the technology, [2] and argued that they had lawfully terminated the technology agreement because the plaintiffs had not acted in good faith [3] and had not used their best efforts to sell kits and conversions. The defendants also disputed the plaintiffs' claim that they would suffer irreparable harm and asserted that, if the injunction issued, their own harm (dissemination of their trade secrets) would be the greater harm. These and other issues were presented to the district court in the parties' briefs, affidavits and oral presentations, but remain unresolved.

2   Although the defendants contended in district court that they had not been paid in full for the technology, they have not pressed this argument before this court.
3   The claim that the plaintiffs had not acted in good faith rested upon allegations of theft of trade secrets.

[*16] We emphasize that we do not signal any displeasure with the result reached by the district court. We simply are unable to review its determination without further specific findings. We therefore vacate the district court's denial of the preliminary injunction and remand to the district court for further proceedings in accordance with this opinion. The district court may, in its discretion, determine that a more extensive hearing is required before the entry of more detailed findings.

Accordingly, the judgment of the district court is vacated and the case is remanded for proceedings consistent with this opinion. Each party shall bear its own costs in this Court.

# CERTIFICATE

### Certificate Concerning Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.     The Court has granted Plaintiffs' Motion to Exceed Word Count Limit

seeking permission to file a brief containing no more than 20,569 words.  This

brief contains 20,552 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Word 2003 in 14

point Times New Roman.

<div style="text-align:right">

Robert P. Reichel (P31878)
Assistant Attorney General
Co-Counsel of Record
Attorneys for Plaintiffs-Appellants
ENRA Division
P.O. Box 30755
Lansing, MI  48909
(517) 373-7540
reichelb@michigan.gov

</div>

## CIRCUIT RULE 31(E)(1) CERTIFICATION

Pursuant to Seventh Circuit Rule 31(e)(1), I hereby certify that the CD being

supplied contains the full contents of the Plaintiffs-Appellants' Brief, Required

Short Appendix, and Appendix (volumes I and II), and does not contain any

computer or other virus.  (This office uses Symantec Anti-Virus program

11.0.4000.2295.)

---

Robert P. Reichel

## PROOF OF SERVICE

I certify that on February 09, 2011, the Brief for Plaintiffs-Appellants

(corrected) was served on all parties or their counsel of record by e-mail and by

placing two true and correct copies in the United States mail, postage prepaid, to

their address of record (designated below).

Robert P. Reichel (P31878)
Assistant Attorney General
Co-Counsel of Record
Attorneys for Plaintiffs-Appellants
ENRA Division
P.O. Box 30755
Lansing, MI  48909
(517) 373-7540
reichelb@michigan.gov

**State of Wisconsin**
J.B. Van Hollen, Attorney General
Cynthia Rae Hirsch
Thomas J. Dawson
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
hirschcr@doj.state.wi.us

**State of Ohio**
Michael DeWine, Attorney General
Lee Ann Rabe
Office of the Attorney General
State of Ohio
30 East Broad Street
Columbus, OH  43215
LeeAnn.Rabe@ohioattorneygeneral.gov

**State of Minnesota**
Lori Swanson, Attorney General
Steven M. Gunn (0038647)
Deputy Attorney General
David P. Iverson (0180944)
Assistant Attorney General
445 Minnesota St., #900
St. Paul, MN  55101-2127
Steven.Gunn@state.mn.us
Dave.Iverson@state.mn.us

**Commonwealth of Pennsylvania**
William H. Ryan, Jr., Acting Atty. Gen.
J. Bart Delone
Pennsylvania Office of Attorney
General
15th Floor, Strawberry Square
Harrisburg, PA  17120
jdelone@attorneygeneral.gov

118

**U.S. Army Corps of Engineers**
Michael T. Gray
U.S. Department of Justice
Environment & Natural Resources Div
Natural Resources Section
P.O. Box 23795 (L'Enfant Station)
Washington, D.C.  20026
michael.gray2@usdoj.gov

**Metropolitan Water Reclamation District of Greater Chicago**
Ronald Michael Hill
100 East Erie Street
Chicago, IL  60611
Ronald.hill@mwrd.org

**Grand Traverse Band of Ottawa and Chippewa Indians**
William Rastetter
Olson, Bzdok & Howard, P.C.
420 East Front Street
Traverse City, MI  49686
rastetter@envlaw.com

**Coalition to Save Our Waterways**
David L. Rieser
Kathleen Cunniff
McGuire Woods LLP
77 West Wacker Dr., Suite 4400
Chicago, IL  60601-7567
drieser@mcguirewoods.com
kcunniff@mcguirewoods.com

**City of Chicago**
Mortimer Parker Ames
Diane M. Pezanoski
Graham G. McCahan
City of Chicago, Law Department
Corporation Counsel
30 North LaSalle Street, Suite 1020
Chicago, IL  60602
mames@cityofchicago.org
dpezanoski@cityofchicago.org
graham.mccahan@cityofchicago.org

**Wendella Sightseeing Company**
Stuart P. Krauskopf
Kurt A. Kauffman
Michael A. Schnitzer
Law Offices of Stuart P. Krauskopf
Suite 210
414 N. Orleans Street
Chicago, IL  60654
stu@stuklaw.com
kkauffman@stuklaw.com
mschnitzer@stuklaw.com

## CIRCUIT RULE 30(D) STATEMENT

Pursuant to Seventh Circuit Rule 30(d), I hereby state that all materials

required by Rules 30(a) and (b) are included in Plaintiffs-Appellants' Required

Short Appendix or in the additional two-volume Plaintiffs-Appellants' Appendix.


Robert P. Reichel